UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RALPH A. GARCIA,

               Petitioner,

     v.

ROBERT BURTON,

               Respondent.

Case No.  19-cv-07600-VC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

## I.      INTRODUCTION

Attorney Tammy Miller was appointed to represent Ralph Garcia in a first-degree murder case in California state court. The prosecution alleged that Garcia was one of three people who attacked the victim, and that Garcia was the one who killed him by stabbing him repeatedly.

The prosecution's case hinged largely on the testimony of two witnesses who said Garcia admitted, in the aftermath of the attack, to being the stabber. One was a co-defendant (one of the three attackers) who pled guilty before Garcia's trial and testified in exchange for a lighter sentence. The other was Garcia's ex-girlfriend. A neutral eyewitness also testified, but she could not identify the "third attacker" (that is, the attacker who the prosecution contended was Garcia). And the neutral eyewitness's description of the third attacker differed from Garcia's physical appearance in non-trivial ways.

Even this short summary makes it obvious that Miller's only chance of effectively defending Garcia was to give the jury reasons to doubt the testimony of the co-defendant and the

ex-girlfriend. But her performance on this front was abysmal. In particular, Garcia's co-defendant made multiple contradictory statements to the police about the manner in which (and the location at which) Garcia admitted to stabbing the victim. Further, those statements were in response to suggestive police questioning—so suggestive that at one point the co-defendant expressed frustration that the police seemed to want him to make things up about Garcia's confession. Many of the statements by Garcia's ex-girlfriend were in response to similarly suggestive questioning, raising at least the possibility that she was merely telling them what she thought they wanted to hear about the stabbing. Miller presented virtually none of this evidence at trial. She did not even make an opening statement, which was her one opportunity to ensure that the jury would view the prosecution's key witnesses with skepticism before they took the stand.

Garcia contends in this habeas petition that his constitutional right to effective assistance of counsel was violated. Typically, to prevail on this type of claim, a defendant must show both deficient performance by his lawyer and a reasonable probability that the jury would have reached a different verdict if the lawyer had performed adequately. But with a federal habeas petition challenging a state court conviction, that's not enough. The federal court must conclude not only that the defendant received constitutionally ineffective assistance of counsel, but also that no reasonable judge could disagree with that conclusion.

Here, no reasonable judge could conclude that Miller's performance was adequate. It's clear from the record that she decided to "wing it" rather than developing a coherent strategy or preparing in any meaningful way. When you are appointed by the government to represent an indigent defendant whose liberty is at stake, you don't just wing it. Especially when your client is facing a first-degree murder charge with the possibility of life in prison. Assuming this wasn't

some sort of aberration for Miller (who now goes by the last name Miller-Holmgren), she has no business representing defendants in murder trials, and the courts have no business appointing her to do so.

But Garcia's habeas petition must be denied because reasonable judges could differ on whether Miller's deficient performance prejudiced Garcia. The evidence Miller should have presented would certainly have heightened doubt about whether Garcia was the stabber. But that evidence would not have cast as much doubt on whether he was one of the three attackers, and merely being one of the attackers made him guilty on an "aiding and abetting" theory. Because Miller's failings at trial went more to the issue of whether Garcia was the stabber than to whether he was involved at all, the Court cannot conclude that any reasonable judge would find that her deficient performance casts substantial doubt on the verdict.

Whether Garcia was prejudiced by Miller's performance would be a closer question on "de novo" review—that is, without the constraints placed on federal habeas courts when reviewing state court convictions. And it's worth noting that the appropriate standard of review in this case is not obvious. As discussed in Section IV, there is a colorable legal argument that review of Miller's most glaring failures should be de novo. For this reason, and because this case is far more difficult overall than most habeas cases, a certificate of appealability will issue.

## II.      FACTUAL BACKGROUND

On the evening of April 17, 2009, Enrique Flores was beaten and stabbed to death in the parking lot of a strip mall in San Jose, California. Sonia Perez, who knew Flores and watched the attack take place from her car in the parking lot, told police that Flores was attacked by three men. Video surveillance from a liquor store in the strip mall showed a group of young men buying alcohol shortly before the attack occurred. Ralph Garcia appeared in these videos, along

with Ernesto Esparza, Raymond Garcia, Daniel Lechuga, and Jose Lechuga, all of whom were members (or aspiring members) of the Norteño street gang Family On Every Side (FOES). The group had been hanging out and drinking at Daniel Lechuga's apartment next to the strip mall during the afternoon and evening.

Daniel Lechuga and Jose Lechuga are brothers. Ralph Garcia and Raymond Garcia are not related; they merely have the same last name. To avoid confusion, this ruling refers to Ralph Garcia (the petitioner) as "Garcia," and to Raymond Garcia as "Raymond."

After an investigation, the police arrested and charged Garcia, Esparza, and Raymond for Flores's murder. Tammy Miller was appointed to represent Garcia, and acted as his counsel for the duration of the trial court proceedings. The three men originally proceeded as co-defendants, but Esparza and Raymond both pled guilty before trial. At trial, Garcia faced the charge of first degree murder with a gang enhancement—the prosecution's theory was that the men attacked Flores because he was wearing a blue work uniform, and the color blue is associated with Sureño gangs, bitter rivals of Norteño gangs. It was undisputed that Esparza and Raymond were two of the three men involved in the attack. The key question was whether Garcia was the third attacker and the one who stabbed Flores. Miller's defense involved casting doubt on whether Garcia participated in the attack, including by suggesting that the third attacker was Daniel or Jose Lechuga.

Only two of the government's witnesses directly implicated Garcia—Esparza, who testified for the government as part of his plea deal, and Lauren Worthington, Garcia's girlfriend at the time of the attack. Worthington, like Perez, watched the attack from a car in the parking lot. Both Esparza and Worthington testified that Garcia was the third person involved in the attack. They also testified that Garcia subsequently confessed to stabbing Flores.

Perez testified, but she was not able to identify the third attacker. She gave a physical description of the attacker that differed in some ways from Garcia. In particular, Perez described someone who was quite a bit shorter than Garcia and who was wearing clothes that differed from what Garcia was wearing when he appeared in the liquor store videos.

Together, the testimony from these three witnesses, along with the videos showing Garcia with Esparza, Raymond, and the Lechuga brothers shortly before the attack, was by far the most important evidence at trial. Accordingly, this section begins with a detailed description of the pre-trial investigation and trial evidence relating to Perez, Esparza, and Worthington, and then follows with a higher-level description of the entire trial.

### A. Sonia Perez

Perez lived in the apartment building next to the strip mall where the attack took place, the same building where Daniel Lechuga lived. She knew Flores because he lived in the area as well and had a daughter around the same age as her own daughter. Perez witnessed the attack from her car in the parking lot and immediately called police to the scene.

Police interviewed Perez twice in the days following the attack, once on April 18 (the night of the attack) and once on April 21. On April 18, Perez told police that there were three men involved—one who appeared to initiate the confrontation, and two others who ran over from a nearby parked car. Perez described one of the men who ran over from the parked car as wearing a red 49ers jersey. This person was later identified as Esparza. She described the other man who ran over from the parked car as wearing a red hat. This person was later identified as Raymond. Perez described the third man—the one who initiated the confrontation—as a "short" (around "five four") Hispanic male who weighed about a hundred and thirty pounds and was wearing a black hat, black shirt, and dark colored shorts.

During the first interview, police also showed Perez the video surveillance recordings from the liquor store. While watching the recordings, Perez identified the two attackers who ran over from the parked car by the 49ers jersey (Esparza) and the red hat (Raymond). At one point she said, "It could have been them three." She and the police then have the following exchange: [1]

Sergeant: What do you think about that guy?

Perez: Uh, it could have been him.

Sergeant: Okay.

Perez: Like to me, if you ask me, I think those are the three of them.

Sergeant: Okay.

Detective: So, you think that the guy with the hat is the guy that –

Perez: I think it's these two.

Detective: Okay.

Perez: But not that one.[2]

Detective: And you think, you think this is the guy that followed the victim out and then confronted him or no?

Perez: No.

Detective: Okay, so you think these are the two guys that were sitting in the car?

Perez: Cause this guy's fatter. The guy that talked to him was skinny.

Sergeant: Oh. So, you think that that guy with the red 49ers shirt, you think that's the

---

[1] For some of the police interviews conducted in connection with this case, the record includes both written transcripts and audio or video recordings. For Perez and Esparza, there are written transcripts and videos. For Worthington, there is a written transcript and an audio recording. Occasionally, the written transcripts do not accurately capture what can be heard in the recordings, either because the written transcript incorrectly transcribes the dialogue, or because the written transcript marks dialogue as unintelligible (with an asterisk (*)) even though it can be clearly heard on the recordings. In these instances, the Court uses the dialogue as heard in the recordings, and notes the discrepancy with the written transcript in a footnote.
[2] In the written transcript, this appears as "Perez: (*)."

other guy that was in the car, the car with the red hat?[3]

Perez: Yeah.

The record is not entirely clear about which part of the video recordings Perez is watching during this exchange. But it seems almost certain, from looking at the liquor store video recordings in conjunction with the video and transcript of Perez's interview, that the exchange occurred at a time when the video shows Esparza and Raymond together with a third man who is not Garcia.[4]

During her second interview, Perez described the third assailant as "dressed in black," "shorter" than Flores, and "bald" with his hair just starting to grow out. She also stated that he had on a "black sweater" with a "hood," and that she could not see Flores's face because the attacker's "hood was in the way." Finally, Perez told police that someone was wearing shorts—either the initial attacker or Raymond—but that she could not remember who.

At trial, Perez testified that while sitting in her car at the strip mall, she saw two men in a parked car a few spaces over—one wearing a red 49ers jersey (Esparza), and one with a red hat (Raymond). She also saw Flores come out of the liquor store and begin talking to someone. She

---

[3] In the written transcript, this appears as "Sergeant: Oh. So, you think that guy with the red (*) shirt and then that's the other guy that was in the car with the guy with the red hat?"

[4] There are recordings from two liquor store cameras: a Channel 3 recording from a camera showing the liquor store's front door, and a Channel 4 recording from a camera positioned behind the checkout counter. The police note that the first video they will show Perez is "on channel three," but they then say the video "will also move to the counter" and will "show some people going up to the counter." This must refer to the Channel 4 recording, because the Channel 3 one never shows the counter. It thus seems that the video the police played Perez began with footage from the Channel 3 recording and then moved to footage from Channel 4. When Perez first identifies Raymond as the one in the red hat, it seems almost certain that the video has already switched to Channel 4: the police state that the identification is made at "twenty, twenty one, O, eight" and the Channel 4 recording at 20:21:08 shows a man in a red hat, while the Channel 3 recording at 20:21:08 does not. Perez and the police have the exchange described here *after* identifying Raymond in the red hat, such that they are almost certainly still watching Channel 4. Moreover, the end of the Channel 4 recording shows three people—one wearing a red 49ers jersey (Esparza) and one wearing a red hat (Raymond)—standing behind the counter, which matches what Perez describes.

said the conversation became "confrontational" as the person talking to Flores became more aggressive. Perez stated that she thought that person was wearing "a black hoodie," but that she could not be "absolutely positive." She also testified that she could not hear any yelling from where she was. Perez then saw Esparza and Raymond run over from the other car in the lot. She saw Raymond punch Flores in the face, and said the punch was so forceful that she was able to hear it as well. She then watched all three attackers "ambush[]" Flores, jumping on top of him and punching him. She testified that after she called the police, the three attackers "scattered" and took off running.

On cross-examination by Miller, Perez confirmed that the man who confronted Flores was wearing a black hooded sweatshirt. Perez also confirmed that the sweatshirt was solid black without any logo, and that she told that to police officers on several occasions. Miller also got Perez to confirm that the man confronting Flores was "much shorter" than him, "was short enough that [she] could see over his head and see all of [Flores]'s face," and that she could see Raymond punch Flores "over the top of the head of the fellow in the black hooded sweatshirt." Miller also asked Perez to clarify what she observed during the attack, and Perez reiterated that all three men were participating equally and were bent over punching Flores; nobody was merely standing by or playing a more minor role. Finally, Miller had Perez confirm that all three men took off running after the attack.

Miller did not, however, bring out Perez's prior statements to the police that the man who initially confronted Flores was 5'4" and about 130 pounds, wearing dark colored shorts, and either wearing a hat or bald with his hair just starting to grow out. Miller also did not elicit Perez's prior statement that she could not see the third attacker's face because it was blocked by the hood of his sweatshirt, or her statements while watching the video recordings that it "could

have been them there" and "I think those are the three of them."

On re-direct, Perez testified that she was never able to positively identify the third attacker who first confronted Flores because she was never close enough to see his face. She also stated that she could hear something being said during the attack, but she was not sure what it was.

### B. Ernesto Esparza

Prior to trial, Esparza gave two statements to the police. The first was in April 2009, about one week after the attack and before either he or Garcia was arrested. Esparza initially denied any knowledge of or involvement in the attack, and any familiarity with Garcia, Flores, or Raymond. The police told him they already had a lot of information about what occurred, and told him to "defend" himself because "it was either you or it was Ralphy" who stabbed Flores. Eventually, Esparza admitted that he and Raymond were involved, and named Garcia as the third attacker.

But Esparza said he did not know while the attack was happening that Flores was getting stabbed, and figured Garcia was just punching Flores because Esparza saw Garcia hitting Flores with one hand and "slouched" over his body. Esparza said he only learned later that Flores had been stabbed and that Garcia had been the one to do it. Esparza first told police that Garcia "didn't actually verbally" tell him he had stabbed Flores, but that he "must have been" the stabber. Esparza then said that he couldn't remember who first told him that Flores had been stabbed. After the officer told him he "need[ed] to remember," Esparza said that Garcia told him while they were "back drinking." The officer then asked, "Inside Daniel's apartment?," to which Esparza responded, "Not inside. Uh, I believe it was outside." The officer then asked twice whether it was "by the carport," without Esparza giving a clear answer. Moments later, Esparza

said that Garcia implicitly confessed by saying "I got that fool" out loud, which Esparza "figured" meant that Garcia stabbed him, but Garcia "didn't say it directly." Shortly after that, the following exchange took place:

> Officer: And where were you guys at really when he tells you this?
>
> Esparza: Huh?
>
> Officer: Where are you guys at really when he tells you this?
>
> Esparza: I don't know what else it is you guys – you guys –
>
> Officer: Just ans – we'll wrap it up.[5]
>
> Esparza: I mean come on. I mean yeah, we're gonna wrap it up. I mean I'm tired and it's already late. I just really want to just go to bed. That's all I want right now, I mean.
>
> . . .
>
> Esparza: I just really want to just go to bed. I mean I just – just, I mean, I just really want to go to bed. I'm – I'm just tired of this. I just – I really don't want to put up with this no more. I told you, I mean, what I know. I mean you guys are trying to, you know, get me to, you know, cook up a new story or something I –
>
> Officer: No, we're not. No, we're not. Here's – here's the deal. There's a little piece of this –
>
> Esparza: You just want me to lie to you or something?[6]
>
> Officer: Well, no. There's – there's little pieces of this that we just – that we want to get out. There's little pieces that we don't know and, like my partner said, that we've gotta hear from you because –
>
> Esparza: What is it that you guys need to hear from me?
>
> Officer: – you had, you had involvement in it. Where were you when Ralphy told you he stabbed him?[7]

[5] In the written transcript, this appears as "Officer: (*) and we'll wrap it up." Watching the video of the interview makes clear that the officer starts to say "Just answer" before stopping himself mid-word and interjecting with "we'll wrap it up."
[6] In the written transcript, this appears as "Esparza: You just want to (*) or something?"
[7] In the written transcript, this appears as "Officer: You haven't – you haven't told me that. Where were you when Ralphy told you he stabbed him?"

Esparza: I was, uh – I was, uh, outside smoking a cigarette down by the carport.

At the end of the interview, the police arrested Esparza.

Esparza gave a second statement to the police almost three years later, in February 2012, a few weeks before Garcia's trial. At the time of this second statement Esparza had already accepted a plea deal, pleading "guilty or no contest" to voluntary manslaughter and admitting the attack was gang-related in exchange for his testimony against Garcia. During this statement he gave a more detailed account of his relationship with Garcia and their membership in the FOES gang, as well as a more detailed description of what occurred during the attack. Esparza stated that Garcia was on Flores's right side "making like these little . . . little weak bitch-ass punches," which he later described as "little mini punches," where Garcia was hitting Flores with the side of his hand. Esparza again said he didn't see a knife during the attack and didn't know until later that Flores had been stabbed.

As he did during his first statement, Esparza told the police that Garcia confessed to stabbing Flores, although the details of the confession story differed somewhat from the first statement. In contrast to the first interview, when Esparza said the confession was both implicit and took place outside Daniel Lechuga's apartment while they were drinking or smoking a cigarette, during the second interview, Esparza said Garcia explicitly confessed to the murder while they were doing cocaine in a friend's car at the drive-in. Esparza added that Garcia said he attacked Flores because Flores was "mugging" him. Moreover, Esparza also said (apparently for the first time) that Garcia told him he threw the knife into the creek behind the apartments near where the attack took place. Esparza said Garcia told him this while the two were walking together to a court hearing sometime after they had both been arrested but before Esparza pled guilty. As described below, Worthington also told the police that Garcia threw the knife used to

stab Flores into the creek behind the apartments, and Esparza heard Worthington testify to this during a court hearing that took place less than a month before Esparza's second police interview (the interview where Esparza first told the police that Garcia threw the knife into the creek).

Esparza's trial testimony generally resembled the second statement he gave to the police. Esparza first confirmed that he pled "guilty or no contest" to voluntary manslaughter and admitted the gang enhancement in exchange for his testimony in the case and a sentence of no more than 21 years. He then described what took place the night of the attack. He said that he was hanging out at Daniel Lechuga's apartment, located next to the strip mall, with a group of friends, including Garcia, Raymond, and Daniel and Jose Lechuga. All of the men were members of the Norteño street gang FOES, except for Jose Lechuga, who was a gang recruit. Esparza stated that they were drinking and doing cocaine that evening, and had gone to the liquor store in the strip mall to buy beer. He identified himself and his friends as they appeared on the liquor store surveillance recordings: he was wearing a 49ers jersey, Raymond was wearing a red hat, Daniel Lechuga was wearing a green shirt and a black beanie, and Garcia was wearing a black shirt. Esparza testified that, at some point, he and Raymond saw Garcia wander away from the group and get into Worthington's car in the strip mall parking lot. Esparza and Raymond got into a different car in the parking lot to smoke some weed. Shortly after, they saw Garcia "squaring up" with another guy at the edge of Worthington's car. Esparza testified that Raymond immediately sprinted over to see what was happening, and that Esparza followed a few steps behind.

Esparza testified that when he and Raymond arrived to where Flores and Garcia were standing, Raymond knocked Flores out with one punch. Raymond then stood to Flores's left side beating him up, and Garcia stood on Flores's right side "striking" him with his right hand.

Esparza described Garcia's movements as "weird" "mini" "soft" punches, hitting the victim on the chest with the area on the side of his hand between the forefinger and thumb. Esparza testified that he tried to kick the victim but "missed" and merely "grazed" him, and that he hung down by the victim's feet while the other two men were up by his chest. Esparza said that he could not see whether Garcia had a knife, but that Garcia was the only person hitting Flores in the chest. Esparza said that he and Raymond walked back toward Daniel Lechuga's house after the attack, and that Garcia got back into Worthington's car. Esparza and Raymond then headed back to the parking lot to get their car, but turned around and ran back to Lechuga's apartment when they saw police and Flores still lying on the ground. At Lechuga's apartment, Esparza took off his jersey when Lechuga suggested he change clothes to avoid being recognized by the police. The group of them then headed to a drive-in movie theater.

Esparza stated that Garcia explicitly confessed to stabbing Flores while they were at the drive in. Esparza couldn't remember whether Garcia told him why he stabbed Flores—he "just said he stabbed him"—but that Garcia told him later on that he got out of Worthington's car because Flores was "mugging" him (that is, giving him a dirty look). Esparza remembered Garcia saying "something about" stabbing Flores while they were doing cocaine with Daniel Lechuga and other gang members, and that Daniel was mad because Flores was related to the Lechugas by marriage (Jose Lechuga's girlfriend is sisters with Flores's common-law wife). Esparza testified that when they ultimately learned that Flores had died, Garcia told them he was going to take responsibility for the stabbing. Esparza also testified that Garcia sometimes carried a folding knife, and that after they were both arrested and were walking together to a court appearance, Garcia told him he threw the knife used to stab Flores into the creek by the apartments.

Finally, Esparza testified about the membership, recruiting, and activities of the Norteño FOES gang in which he, Garcia, and Raymond were all members. He testified that Norteños generally wore red, and that they had a deep rivalry with Sureño street gangs, whose members generally wore blue. He also testified that this rivalry frequently involved violent altercations.

On cross-examination, Miller first elicited testimony about Esparza's violent past and his actions as a prominent "gang banger." She asked Esparza about his friendship with Garcia; Esparza confirmed that the two were good friends. She also elicited testimony about Garcia's drug and alcohol consumption on the night of the attack and about the culture of violence and drug dealing in the gang. She attempted to discredit Esparza's testimony that Garcia told him he threw the knife in the creek while the two of them walked to court together by asking about the circumstances of this alleged confession. She got Esparza to confirm that it occurred about a week after Esparza was arrested, after the two had appeared in court on their murder charges, and while the two were walking to court surrounded by court deputies.

Miller also asked Esparza about the night of the attack and the respective roles played by him, Garcia, and Raymond. Esparza confirmed that he and Raymond "walked" (rather than ran) away from the attack; that Esparza took off his jersey and left it in Daniel Lechuga's apartment after Lechuga suggested he do so to avoid the police; that Esparza's participation in the attack was merely a "grazed kick" and one punch to Flores's legs; that Esparza only saw Raymond punch Flores once and then couldn't see what Raymond was doing with his hands; and that Garcia was hitting the victim with "soft" "mini punches" with his right hand while standing on Flores's right side. Miller showed Esparza two still frames from the liquor store video recordings on the night of the attack showing three men—Esparza, Raymond, and a third man in a black hoodie—standing and leaving the liquor store together. Esparza stated that he did not recognize

and could not identify the man wearing the black hoodie. (Police officers later testified that this man was Jose Lechuga.)

Finally, Miller asked Esparza about his plea deal and his various statements to the police. She had Esparza confirm that he pled to voluntary manslaughter and the gang enhancement, and that his understanding was that he could get no more than 21 years in jail. She then attempted to ask Esparza various questions about his understanding of the deal, to which the prosecutor successfully objected. Esparza eventually stated that he was "supposed to tell the truth," and that if he lied he would get 21 years in jail, but if he told "the truth" he could "possibly get less." Esparza also admitted to lying to the police during his first interview, but stated that he was "trying to trick" them and just wanted to figure out what the police knew because he didn't want to get in trouble. He testified that his statements during his first interview were "mixed"—some were lies, some were truth—and that once the police caught him lying, he "started coming forth" and telling them what actually happened.

Miller did not elicit on cross-examination any of Esparza's prior statements about how he learned that Flores had been stabbed or how Garcia confessed to the stabbing. Specifically, Miller did not ask about Esparza's prior statements that he could not remember who first told him that Flores had been stabbed; that Esparza only "figured" it was Garcia but Garcia never "verbally" told him; that Garcia implicitly confessed by saying "I got that fool"; and that Garcia confessed while they were outside Daniel Lechuga's apartment drinking or smoking a cigarette down by the carport. Miller also did not bring out the suggestive context in which Esparza made these statements, how the police told him to "defend himself" because they knew it was either him or Garcia who stabbed Flores, or how Esparza expressed to the police at the end of his first interrogation that he felt they were trying to get him to lie about Garcia's confession.

## C. Lauren Worthington

The third eyewitness to testify at trial was Lauren Worthington, who was dating Garcia and a few months pregnant with his child at the time of the attack. Worthington gave a series of statements ahead of trial, both to police and to a defense investigator, that were indisputably inconsistent. There was concern that she would not appear if called to testify at trial, so the court held a "conditional examination" a few months before trial began. Garcia, Esparza, and Raymond were all present as co-defendants, as neither Esparza nor Raymond had yet pled guilty. It was Raymond who called Worthington as a witness. Worthington indeed refused to appear as a witness at trial, despite a bench warrant issuing for her arrest, and so the jury watched a video recording of the conditional examination.[8]

Police first talked to Worthington in April 2009, about ten days after the attack (and the same day they arrested Garcia).[9] Worthington told police that she had known Garcia for about six months, had been dating him for about four or five months, and had been pregnant with his child for about three and a half months. At first, Worthington stated that the only thing she knew about the incident was that there was a warrant out for Garcia's arrest relating to a homicide, and that Garcia hadn't told her anything else about what happened. After additional questioning, Worthington told them she was present at the parking lot the night of the attack, and that she saw Garcia and two of his friends standing in a circle in her rearview mirror. She said she thought it

---

[8] During the conditional examination, counsel used audio clips of portions of Worthington's 2009 police interview. Although the written transcript does not make clear which portions of the 2009 interview were played, the audio clips can be heard while watching the video recording of the conditional examination. Moreover, while playing the video during trial, the trial court noted that at points the audio recordings were difficult to hear, and the parties agreed to give the jury a transcript of the portions of the 2009 interview that were played during Worthington's conditional examination.

[9] The written transcript of Worthington's interview begins on "Clip 4," which is about halfway through the interview. Worthington's full interview can only be heard via audio recording.

was "just a fight."

The police continued to question Worthington about what happened, and told her that they knew she was withholding information. They implied that she needed to give them more details about the attack or she herself would be in legal trouble. For example, the police told her that she could no longer keep herself "distanced" from what occurred because Garcia had "sucked" her into it, and that when someone is "involved or even on the sidelines" of something as serious as a murder, that person can themselves get in trouble for it. The police told her it was "important" that she not "get caught up in something."

Eventually, Worthington gave them more details. She said that Garcia was in the car with her in the parking lot before the attack, and then got back into the car after the attack, at which point they drove away. She said she watched the attack itself through the car's rearview mirror and could see three people—two of whom she knew to be Garcia and Esparza and a third who was wearing a hat—standing in a circle and yelling. Worthington also told them that Garcia said the guy they were fighting was a "scrap"—a derogatory word for a Sureño—and that he stabbed someone. She also said Garcia told her he changed his shirt after the attack. Finally, Worthington told them that Garcia said he threw the knife into the creek, which she thought meant the creek by the apartments next to where the attack took place.

The police also asked Worthington about Garcia's gang involvement. She said she knew he was in a Norteño street gang because he wore red and she had heard him yell "Norte," the gang slogan for Norteño gangs. The police then asked if she heard him yell "Norte" the night of the attack. She said Garcia "might have said it," but she didn't know if she "actually heard that" because she "just heard him say something." The following exchange ensued:

Detective: Did it sound like Norte?

Worthington: Kind of, yeah, but it was more of – I mean it was more of not too loud either at the same time, so it was like I couldn't really hear too much, but I heard that one yell and that was it.

Detective: And what was that one yell?

Worthington: I – um, what you guys said, I guess. I don't know. Like I said, I heard little bits of it.

Detective: But at least that one yell, what do you think that one yell was?

Worthington: I'm pretty sure it was that.

Detective: What?

Worthington: Norte.

Worthington spoke to a defense investigator roughly a year later, in March 2010. She recanted much of what she told the police in her earlier statement. Most notably, she told the investigator that she did not see anything that happened outside of her car. She spoke to police again in November 2011, at which point she re-affirmed the statements she had given to police in April 2009 and disavowed the statements she had given to the investigator in 2010. She also said she wanted witness protection because she was scared of Garcia and did not want to testify against him.

Worthington's conditional examination took place in February 2012, and it is this testimony that the jury heard via videorecording. During the examination, Worthington appeared both unable to remember much of her earlier testimony and reluctant to commit to one story; lawyers for all three defendants and the government had to continually refresh her memory and clarify her testimony using transcripts and recordings of prior interviews. Although she admitted that there were times during her April 2009 interview when she was not telling the truth and wanted to protect Garcia, she generally affirmed the statements she made to police at that time, and disavowed the statements she later made to the defense investigator, saying she lied to help

Garcia and because she wanted Garcia to think that she was on his side so that their son could have a relationship with him. She said she was scared to testify because she feared that Garcia and his family would hurt her.

Worthington testified that on the day of the attack, Garcia had tried to break up with her, and she had driven to San Jose to talk to him. She picked him and some of his friends up in the afternoon and dropped them off at the strip mall parking lot near Daniel Lechuga's apartment. Later in the evening, she came back to try to talk to him again. He got into her car for a few minutes, but then got out. She said she saw three people standing in a circle in her rearview mirror; she did not see any fighting but she did hear some yelling. Worthington said that Garcia then got back into her car and told her that he had stabbed someone. She stated twice during the conditional examination that Garcia did *not* tell her what happened to the knife he used, but then confirmed that she told police in April 2009 that he said he threw it in the creek. There were other parts of her April 2009 statement that she did not remember giving, but that she confirmed during the examination were part of her earlier statement, including that Garcia said he stabbed the victim in the chest; that Garcia said he did this because the guy was a "scrap"; that Worthington thought Garcia stabbed Flores to impress her and prove he was not a "poodle" (a wimpy gang member); and that she heard him yell "Norte" during the attack.

On cross-examination, Miller asked Worthington about inconsistencies in her statements—Worthington agreed that parts of her story had changed every time—and about her history of prescription drug use. Miller also asked Worthington about her relationship with Garcia. Worthington said that she never saw Garcia act aggressively or confrontationally, and thought of him as a "kind" and "gentle" person, but that their relationship had been turbulent. She said she was mad at Garcia on the day of the attack because he had broken up with her, and

that she was "furious" with him a few days later when she gave her first statement to the police because she had recently found out that he had slept with his other girlfriend, Jessica Martinez, even though he knew Worthington was pregnant. In 2011—a few months before her second police interview—Worthington learned that Garcia had impregnated Martinez. Worthington testified that on the day of the conditional examination, she was no longer mad at him and still loved him.

Miller also asked Worthington about her testimony that she was "scared" of Garcia. Miller elicited that even after Worthington told police that she was scared, she continued to support Garcia financially while he was in jail, and brought their son to visit him there. Miller also elicited that Worthington lived with Garcia's sister and dad for about eight months in 2011 without them or anyone else in Garcia's family threatening her. Worthington further admitted that she was still in love with Garcia and wrote love letters to him in April 2011 while he was in jail begging him to marry her.

Miller did not elicit on cross-examination information about the suggestive nature of Worthington's first police interview. For example, Miller did not ask Worthington about the veiled warnings the police gave her to imply that she needed to give them more information about Garcia's involvement in the attack to avoid facing criminal liability herself, or about the exchange leading up to Worthington telling the police that she heard Garcia yell "Norte." In addition, Miller did not elicit Worthington's statement during her first police interview that she did not "give a shit what happens" to Garcia, or enter into evidence letters Worthington allegedly sent to Garcia while he was in jail apologizing for exaggerating her story to the police.

### D. Overall Summary of Trial

Garcia's trial began in April 2012. The prosecution gave an opening statement; Miller

reserved hers, and then also declined to give one at the close of the prosecution's case-in-chief.

In addition to Perez, Esparza, and Worthington, six other witnesses testified for the prosecution. Officers Tim Alford and Robert Forrester described the crime scene, and how they arrested and processed Garcia, Esparza, and Raymond. Officers Enrique Hernandez and Ian White testified as gang experts. They described the symbols and structure of FOES, and the rivalry this Norteño street gang has with Sureño street gangs. Officer Hernandez testified that a Norteño will attack someone who is wearing blue as a way to establish respect and power, and that these attacks can be violent, involve yelling out the gang moniker, and sometimes begin from just one person "mugging" another person. Both officers also testified about other acts of violence committed by FOES members, and about Garcia's membership in the gang.

Detective John Barg—who investigated the murder and interviewed the defendants and eyewitnesses—testified about who appeared in the liquor store videos. He stated that the videos showed Garcia, Esparza, Raymond, Daniel Lechuga, and Jose Lechuga in the liquor store about an hour before the stabbing. On cross-examination, Miller elicited from Detective Barg that police conducted an extensive search of the creek next to the apartments but never recovered a knife, and that Esparza did not tell police that Garcia told him about throwing the knife in the creek until after Esparza heard Worthington say this at her conditional examination. Detective Barg also testified about Garcia's and Jose Lechuga's physical appearances the night of the attack—Garcia was about 5'10" and weighed about 160 pounds, and Jose Lechuga was about 5'6" and weighed about 165 pounds. As seen on the liquor store videos (about an hour before the attack), Garcia was wearing a black t-shirt with a sharks logo, and Jose Lechuga was wearing a black hooded sweatshirt.

Finally, the prosecution called Dr. Joseph O'Hara, the forensic pathology expert who

conducted Flores's autopsy. Dr. O'Hara testified that Flores had 10 stab wounds on his chest and abdomen, all of which were caused by the same knife with the blade facing downward and the blunt end facing upward. Dr. O'Hara testified that the trajectory of the wounds were all from the front of the body towards the back, and angled slightly downward. Eight of the stab wounds were produced from the knife entering the right side of Flores's body and pointing towards the left, and two of the wounds came from the knife entering the left side of Flores's body and pointing towards the right. On cross-examination, Dr. O'Hara confirmed that all of the wounds were on the front of Flores's body, that the trajectory of the wounds were downward toward his feet, and that they spanned the distance of the victim's torso, from his chest down past below his belly button. Finally, Dr. O'Hara confirmed that the two wounds originating from the left side of the body had different trajectories from the wounds on the right, such that either the victim or the stabber had to have moved at some point during the attack.

The trial court also read to the jury a stipulation that the 49ers jersey Esparza wore the night of the attack had two blood stains on it. One stain was located on the upper chest area, and the other on the lower left arm. The blood was primarily Raymond's blood, and was mixed with the blood of at least one other unidentified person; Garcia, Jose Lechuga, and Daniel Lechuga were excluded as matches, and Esparza couldn't be excluded or confirmed as a match.

Miller called three witnesses. First, she called Nancy Nieto, Flores's common law wife and the mother of Flores's daughter. Nieto testified that she spoke with Jose Lechuga twice the night of the attack. She first called Jose from the hospital and told him that she knew the guys he was with had something to do with the stabbing; he responded that she was stupid for involving them. Later, when she called to tell him that Flores had died, Jose said, "I'm sorry." Nieto also testified that Flores always wore blue as his work uniform, and that Jose Lechuga knew Flores

and would be able to recognize him.

Second, Miller called Kory Montrouil, who lived in and managed the apartments next to the strip mall where Perez and Daniel Lechuga lived. Montrouil testified that on the night of the attack he saw three men running from the liquor store back towards the apartment complex and that one of the men was Daniel Lechuga. He said Daniel appeared "frantic" and immediately ran upstairs to his apartment. The two other men peaked around the corner back towards the liquor store. Daniel then ushered his wife, children, and three other men (including the two who had run back from the liquor store with him) into two cars, yelling "we got to go, got to go." On cross-examination, Montrouil stated that the men may have been walking quickly, not running, and that he wasn't paying that much attention to what was going on.

Finally, Miller called Christina Anaya, Garcia's sister who lived with Worthington in 2011. Anaya testified that Worthington told her she "regretted exaggerating" to the police what she saw the night of the attack, and that Worthington said she had been upset after learning that Garcia had gotten another girl pregnant. Anaya said Worthington also told her that she couldn't see much from her car because she was facing the wrong direction and it was dark. Lastly, Anaya testified that she saw Worthington taking and selling prescription pills, and that she observed Worthington frequently become angry and forgetful.

In closing arguments, the prosecutor began by asking the jury to consider how this stabbing could have happened to "anyone," and that although Garcia's actions may seem senseless to the "civilized" members of the jury, they are the product of an "uncivilized" gang and deserve the jury's "condemnation." He argued that Garcia was motivated to kill Flores for the FOES gang, as evidenced by him yelling "Norte," and to prove himself as a "man" to Worthington. He argued that "Esparza is telling you the truth," and that there is "nothing

inconsistent" about what Esparza said—that his entire testimony was corroborated, including by Worthington, who was "enough by herself" to convict Garcia.

Miller did not dispute Garcia's membership in FOES, and focused her closing on arguing that it was a case of mistaken identity. She asserted that both Worthington and Esparza lacked credibility, as evidenced in part by Esparza telling police the story about the knife only after hearing Worthington say it, and that they both had personal reasons to lie. She argued that the jury should believe Perez, who testified that the third attacker was short and wearing a black hoodie—a description that did not match Garcia and better matched Jose Lechuga—and that there was more evidence of Esparza's and Raymond's guilt than Garcia's. Miller also argued that Esparza taking off his bloody 49ers jersey was evidence of his guilty conscience, stating, "guilty people change their clothes." She ended with a final attack on Esparza's credibility by arguing that Dr. O'Hara's description of Flores's wounds was inconsistent with the description of the attack given by Esparza, and more consistent with Raymond straddling the victim and stabbing him repeatedly.

The prosecutor gave a short rebuttal, again emphasizing the consistency of Esparza's statements and arguing that both Worthington and Esparza were "worthy of belief." The prosecutor implied that if Worthington and Esparza were lying, their stories would have been packaged more cleanly—for example, Worthington would have said that she saw blood when Garcia got back in the car, and Ezparza would have said that he actually saw Garcia stabbing Flores. The prosecutor also told the jury that even if they believed that Raymond stabbed Flores, Garcia would still be guilty of first-degree murder under an aiding and abetting theory for having encouraged and facilitated the attack. The prosecutor noted that this was the theory under which Esparza had pled guilty. In addition, the prosecutor pounced on Miller's assertion that "guilty

people change their clothes," reminding the jury about Worthington's testimony that Garcia changed his shirt after the attack. Finally, the prosecutor ended his rebuttal the way he began his closing—by telling the jury that Garcia "earned the condemnation of our society."

The jury deliberated for about six and a half hours. During that time, they sent three notes with questions to the judge. First, they asked whether Garcia could be found guilty of murder "under the rules of aiding and abetting even if the perpetrator (i.e. stabber) was possibly someone else" and for a "Layman's definition of aiding and abetting?" The court responded "yes," and told the jury to "please review instruction CALCRIM 401 [on aiding and abetting]."

Second, the jury sent a note asking for the definition of "perpetrator." The court responded by providing CALCRIM 400, which is the jury instruction on the general principles of aiding and abetting. CALCRIM 400 provides: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

Finally, the jury asked: (1) "In Calcrim 520 [the jury instruction for first- or second-degree murder with malice aforethought], the word 'defendant' is used. If we find the defendant (Ralph Garcia) implicated due to aiding + abetting, can we substitute 'perpitrator' [sic] for 'defendant' in Calcrim 520? Or must Calcrim 520 apply solely to the defendant?"; and (2) "are we missing any instructions pertaining to the definition of murder 2." The court responded to the first question with "yes, in this context, they are interchangeable," and gave the following response to the second: "No. [The jury instruction for first- or second- degree murder with malice aforethought] provides for the structure of both first and second degree murder. If you

determine that (1) perpetrator caused death of another; (2) perpetrator acted with malice aforethought; and (3) killed without lawful excuse or justification, then determine whether 1° or 2°. If 1° does not apply, but 1-3 proven, then it is 2°."

The jury convicted Garcia of first-degree murder and found that the murder was committed for the benefit of a criminal street gang. The trial court sentenced him to thirty-five years to life in prison.

## III.    PROCEDURAL BACKGROUND

### A.  Direct Appeal

Garcia appealed the first-degree murder and gang enhancement convictions arguing that the trial court committed various instructional errors regarding aiding and abetting liability. Garcia also argued that Miller provided ineffective assistance of counsel by failing to request a voluntary intoxication instruction that would have allowed the jury to consider Garcia's intoxication as it related to aiding and abetting liability, and by failing to object to the voluntary intoxication instruction that was given, which limited the jury's consideration of Garcia's intoxication to "whether the defendant acted with deliberation and premeditation."

The California Court of Appeal affirmed Garcia's conviction on direct review. *See People v. Garcia*, 2014 WL 667483, at *1 (Cal. Ct. App. Feb. 21, 2014) (unpublished). The court rejected Garcia's ineffective assistance of counsel claim, holding that Miller made a tactical decision to argue that Garcia was not involved in the attack—instead of arguing that Garcia was involved but not as the stabber—such that requesting a jury instruction on voluntary intoxication as it related to aiding and abetting liability would have been "wholly inconsistent" with Miller's chosen defense. *Id.* at *11. The California Supreme Court denied review.

### B.  State Habeas Petition

In 2014, Garcia filed a state habeas petition in Santa Clara County Superior Court raising various claims, all related to Miller's performance at trial. Garcia argued that Miller provided ineffective assistance based on: (1) her failure to present exculpatory evidence, including from Perez, Esparza, and Worthington; (2) her failure to conduct an adequate pretrial investigation by consulting with a forensic expert about the inconsistencies between the autopsy report and Esparza's description of the attack; (3) her failure to give an opening statement; (4) her failure to impeach Worthington; (5) her failure to call as a witness Jessica Martinez, Garcia's other girlfriend at the time of the attack and girlfriend at the time of trial; (6) her failure to object to improper argument during the prosecution's closing; and (7) her failure to give a competent closing argument.

Miller submitted multiple declarations defending her representation of Garcia. She said she could not give an opening statement because Garcia continuously changed his story about what happened the night of the attack, at times admitting to using the knife that killed Flores, and that she advised him to not testify given the risk of an unfavorable cross-examination. She also maintained that she adequately investigated the case, explored all possible defenses, had strategic reasons for not calling her own forensic expert or giving an opening statement, and gave a closing argument on the issues with which she felt the jury would connect. Garcia, for his part, said that he consistently told Miller he was present at the attack but did not stab Flores, and that Miller had told him he should testify and would make a compelling witness until a few days before trial, when she began to pressure him to not take the stand.

The Superior Court found that an evidentiary hearing was necessary to address Garcia's petition, but strictly limited the hearing to the following issues: (1) whether Garcia told Miller conflicting stories about what happened the night of the attack; (2) whether Miller advised

Garcia to not testify; (3) whether Miller conducted a "lengthy" investigation or "no" investigation; (4) Miller's decision to not present a forensic expert; (5) Miller's decision to not address reasonable doubt in her closing argument; and (6) Miller's decision to not give an opening statement.

Both Miller and Garcia testified at the evidentiary hearing. The only other witness to testify was Michael Ogul, a deputy public defender in Santa Clara County with 35 years of criminal defense experience, and the current supervisor of the homicide team in the Santa Clara County Public Defender's Office. The Superior Court deemed Ogul qualified as an expert on the standard of care applicable to defense attorneys in homicide cases in Santa Clara County. Ogul opined that Miller performed deficiently by, among other things, (i) not giving an opening statement; (ii) not expressly arguing the concept of reasonable doubt in closing and explaining what this means to the jury; and (iii) not consulting with a forensic expert (either Dr. O'Hara or an independently hired one) or using expert testimony to demonstrate the inconsistencies between the autopsy report and Esparza's description of the attack. Ogul evaluated the reasons Miller gave for each of these decisions, and testified that they were without merit and did not change his conclusion that Miller's performance fell below the applicable standard of care.

The Superior Court denied Garcia's habeas petition in a written order that addressed only the claims that were the subject of the evidentiary hearing. *See In re Ralph Anthony Garcia*, Case No. CC941517 (Santa Clara County Super. Ct. June 23, 2017). The Superior Court did not mention Garcia's other claims, which had been raised in his original petition but were excluded from the evidentiary hearing, relating to Miller's handling of Perez, Esparza and Worthington, Miller's failure to call Martinez as a witness, Miller's failure to object during the prosecution's closing argument, and Miller's statement during closing that guilty people change their clothes.

Garcia subsequently filed habeas petitions with both the California Court of Appeal and the California Supreme Court raising essentially the same claims raised in the Superior Court petition. Both petitions were summarily denied.

In 2019, Garcia timely filed a federal habeas petition alleging ineffective assistance of counsel based on the claims in his state habeas petition and the claim raised on direct appeal. Specifically, he argued that Miller performed deficiently by (1) failing to investigate or elicit exculpatory information from Perez; (2) failing to elicit exculpatory testimony from or adequately impeach Esparza; (3) failing to elicit exculpatory testimony from or adequately impeach Worthington; (4) waiving opening statement; (5) failing to give a minimally competent closing argument; (6) failing to consult with a forensic expert or elicit testimony from the government's forensic expert about the inconsistencies between the autopsy report and Esparza's description of the attack; (7) failing to call Jessica Martinez as a witness; (8) failing to object during the prosecution's closing; and (9) failing to request a voluntary intoxication jury instruction related to aiding and abetting liability. He argues that these errors individually and cumulatively prejudiced him at trial.

## IV. LEGAL STANDARD

### A. AEDPA Deference

Garcia's federal habeas petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA strictly limits the circumstances in which a federal court can grant habeas relief to a state prisoner if the federal habeas claims were previously "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d).

"The first step in determining whether [to] give deference under § 2254(d) is to determine which state court decision [to] review." *Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir.

2014). As to the voluntary intoxication jury instruction claim raised on direct appeal, this analysis is straightforward: the California Court of Appeal was the last state court to address this claim, and that court explained its decision in a reasoned opinion. This is clearly an on-the-merits adjudication, and deference applies. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

As to the claims that were first raised in Garcia's state habeas petition, the analysis is more complicated. The California Supreme Court summarily denied Garcia's state habeas petition, so the Court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Id.* Here, the last reasoned state court decision is the California Superior Court's order. But this order—although purporting to deny Garcia's habeas petition entirely—addresses only some of the claims, and is completely silent as to others.

In this situation—where "a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address" other issues—there is a rebuttable presumption that the unaddressed claims have been adjudicated on the merits and deserve § 2254(d) deference. *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013). This presumption has been rebutted as it relates to the Superior Court's order. By all indications, the California Superior Court simply forgot to rule on the unaddressed claims.

First, the court granted an evidentiary hearing on a subset of the issues raised in Garcia's initial petition, and then allowed for post-hearing briefing on just those issues. It then ruled on those issues without discussing any of the claims for which there was no evidentiary hearing. And the trial court addressed the issues that were part of the evidentiary hearing in a thorough fashion, drawing a particularly stark contrast between the way it handled those issues and its failure to even mention the other ones. *See Murdaugh v. Ryan*, 724 F.3d 1104, 1121-22 (9th Cir.

2013). This suggests that the court merely focused on the post-hearing briefing and forgot about the other claims. *See Brown v. Romanowski*, 845 F.3d 703, 711-12 (6th Cir. 2017).

Second, the Superior Court's analysis of the cumulative prejudice claim—which should have discussed prejudice as it related to *all* of the alleged instances of ineffective assistance—stated "for the reasons *listed in the above sections*, if trial counsel had acted differently *in any of these circumstances*, the results would not have changed in any meaningful way for Petitioner." *In re Ralph Anthony Garcia*, Case No. CC941517, at *8 (emphasis added). The fact that the Superior Court discussed cumulative prejudice only with reference to the claims addressed in the order, and not the other claims raised in Garcia's petition, is further evidence that the court overlooked the latter claims.

Third, a California state procedural rule provides: "Any order denying a petition for writ of habeas corpus must contain a brief statement of the reasons for the denial. An order only declaring the petition to be 'denied' is insufficient." Cal. R. Ct. 4.551(g). It would seem unlikely, in light of this rule, that the Superior Court considered and rejected the unaddressed claims without so much as mentioning them, especially when the court thoroughly explained why it rejected the claims it did address.

Fourth, the circumstances that the Supreme Court identified in *Johnson v. Williams* as reasons to apply the presumption that unaddressed claims are decided on the merits are generally not present in this case. The federal claims that the Superior Court failed to address did not rely on a line of state precedent that fully incorporated federal precedent, nor were the unaddressed claims entwined with the addressed ones. *See Williams*, 568 U.S. at 298-99. Garcia's references to the unaddressed claims also were not "fleeting," nor were they "too insubstantial to merit discussion"—to the contrary, they included Garcia's strongest claims. *Id.* at 299; *see also Brown*,

845 F.3d at 711-12. Together, these circumstances overcome the presumption that the unaddressed claims were denied on the merits by the Superior Court, and lead to the conclusion that the court simply forgot to rule on them.

The question then becomes what standard of review applies to these claims that the Superior Court overlooked. If the Superior Court were the only court to have adjudicated Garcia's petition, the answer would be easy—§ 2254(d) deference would not apply and the claims would be reviewed de novo. But that is not what happened. After the Superior Court rejected Garcia's habeas petition, the California Court of Appeal and then the California Supreme Court rejected similar petitions in summary one-sentence denials. And it is well-established that summary denials are generally entitled to § 2254(d) deference, because when "a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). This presumption applies with particular force in the context of California's unique state habeas procedure—in California, "a habeas petition filed in a higher court is a new petition involving the higher court's original jurisdiction" and not merely an appeal of a lower court's denial, which means that when the California Supreme Court adjudicates a habeas petition, it does not "directly review the lower courts' rulings." *Robinson v. Lewis*, 9 Cal. 5th 883, 896-97 (2020).

To be sure, there is the related presumption that the California Supreme Court's summary denial simply adopted the reasoning of the Superior Court's decision. But that presumption can be rebutted "by showing that the unexplained [decision] relied or most likely did rely on different grounds than the lower state court's decision." *Wilson*, 138 S. Ct. at 1192. Here, there are good reasons to believe that the California Supreme Court did not overlook half of the claims

in Garcia's petition the way that the Superior Court did. First, as noted, the California Supreme Court adjudicated Garcia's habeas petition as an exercise of its original jurisdiction, and did not merely review the Superior Court's rulings. *See Robinson*, 9 Cal. 5th at 896-97. Second, all of Garcia's claims—including the ones that the Superior Court forgot to decide—were fully briefed and presented in Garcia's petition to the California Supreme Court. *See Wilson*, 138 S. Ct. at 1192 (noting one way to rebut the presumption that a summary decision adopted a lower court's reasoning is by showing that "alternative grounds . . . were briefed or argued to the state supreme court"). Under these circumstances, a federal habeas court may not treat the California Supreme Court as having rubber-stamped the Superior Court's partial analysis, and must presume instead that the Supreme Court considered and rejected on the merits the claims that the Superior Court overlooked.

Garcia argues that despite the California Supreme Court's summary denial, and the United States Supreme Court's command that summary denials be entitled to full § 2254(d) deference, the claims that the Superior Court failed to address should still be subject to de novo review. This position finds some support in case law. First, the Ninth Circuit has held that "AEDPA generally requires federal courts to review [only] one state decision." *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005). In conjunction with the Supreme Court's instruction to "look through" an unexplained decision to the last related state-court decision, this would seem to counsel against considering both the reasoned Superior Court ruling *and* the California Supreme Court's summary ruling. *See Wilson*, 138 S. Ct. at 1192. But the Ninth Circuit's command to "generally" review "one state decision" does not seem applicable here. First, the Ninth Circuit did not create an absolute bar to reviewing multiple state decisions; in fact, it stated that reviewing multiple decisions would be appropriate in certain circumstances.

*See Barker*, 423 F.3d at 1093. Moreover, and perhaps most importantly, the bar to reviewing multiple state decisions seems to apply only where there are multiple reasoned decisions addressing *one claim* in a habeas petition, not where, as here, one reasoned decision rejects certain claims and overlooks others, and a second decision summarily rejects them all. *See id.* ("[E]ven when one state court adhered to federal law, if the last court to review *the claim* erred, the federal court should review the last decision in isolation and not in combination with decisions by other state courts." (emphasis added)).

Garcia's argument that the overlooked claims should be given de novo review also finds some support in the line of cases holding that a federal court only gives § 2254(d) deference to the specific elements of a claim that the state court addressed, and reviews de novo the other elements of that claim. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Kipp v. Davis*, 971 F.3d 939, 949 (9th Cir. 2020). Garcia argues that the principles laid out in this line of cases would be undermined by assuming that the California Supreme Court's summary denial of the previously unaddressed *claims* is an on-the-merits rejection of those claims, because the denial would not, in the same circumstances, be considered an on-the-merits rejection of previously unaddressed *elements* of a claim. *See, e.g.*, *Amado*, 758 F.3d at 1131 ("[W]here a state court has adjudicated a claim on the merits with a written decision denying relief based on one element of the claim and therefore does not reach the others, federal courts should give § 2254(d) deference to the element on which the state court ruled and review *de novo* the elements on which the state court did not rule.").

But there seem to be good reasons to not apply those principles here. Most notably, the reasoned lower court decision here did not reject a claim based on one element of that claim; it rejected some of the claims and failed to address others. In the former situation, it is easier to

presume that the state supreme court adopted the lower court's reasoning. In the latter situation, as is the case here, that presumption is more readily rebutted. In addition, this approach of reviewing de novo the elements of a claim that were presented to but not explicitly rejected by a state court—which was originally adopted in a 2003 Supreme Court case—seems hard to square with the Supreme Court's more recent holding that a state prisoner whose habeas petition was summarily denied in state court must show "there was no reasonable basis for the state court to deny relief," regardless of "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Richter*, 562 U.S. at 98. Indeed, there is some debate among the federal Courts of Appeals about the continued validity of only giving § 2254(d) deference to the elements of the claim that the state court reached while reviewing de novo the unaddressed elements. *See Amado*, 758 F.3d at 1132 n.8.

Garcia's situation is thus an unusual one, where the only reasoned state court decision to reject Garcia's claims inadvertently omitted over half of them, but a later state court decision summarily rejecting the entire petition must be understood to have considered them all. For the reasons described, all claims must be considered "adjudicated on the merits" and entitled to § 2254(d) deference. Under § 2254(d), relief cannot be granted unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As to the claims rejected by the state court in a reasoned decision, this Court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at

1192. As to the claims the Superior Court overlooked and the California Supreme Court summarily denied, this Court "must determine what arguments or theories supported or . . . could have supported the state court's decision" and then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with prior United States Supreme Court case law. *Richter*, 562 U.S. at 102.

### B. *Strickland* Standard

For claims of ineffective assistance of counsel, the "clearly established" Supreme Court law derives from *Strickland v. Washington* and its progeny. *See Andrews v. Davis*, 944 F.3d 1092, 1107-08 (9th Cir. 2019). Under *Strickland*, a petitioner claiming that trial counsel violated their constitutional right to effective assistance of counsel must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Where, as here, the ineffective assistance of counsel claims are made in a federal habeas petition governed by § 2254(d), a petitioner's burden to prove entitlement to relief is "all the more difficult" because both the *Strickland* standards and the § 2254(d) standards are "highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 105 (quotations and

citations omitted); *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). The relevant question is thus not whether the state court incorrectly applied *Strickland*, because "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). The critical question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

As with the standard of review, there are a few preliminary questions about how to properly assess Garcia's ineffective assistance of counsel claims. The parties, along with the California Superior Court, seemed to assume that each alleged instance of deficient performance should be analyzed separately in determining whether Miller performed deficiently under *Strickland* step one. But that seems like the wrong way to evaluate an ineffective assistance of counsel claim based on multiple alleged deficiencies. The more appropriate analysis—at least in cases where many different errors are alleged—involves considering whether trial counsel performed deficiently in their overall representation of the petitioner, not examining one-by-one whether each failure individually rose to the level of deficient performance. In other words, the question of deficient performance at *Strickland* step one must at least sometimes involve a cumulative analysis, similar to the prejudice analysis at *Strickland* step two. *See, e.g.*, *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995).

Analyzing deficient performance error-by-error presents multiple analytical problems (not to mention fairness problems). Consider a situation where a petitioner alleges that his trial counsel performed deficiently in 15 ways over the course of a trial. And imagine that each alleged mistake came close on its own to falling below prevailing professional norms, but could not, when viewed in isolation through *Strickland*'s deferential lens, be labeled "deficient." Counsel's overall performance at trial was obviously deficient, but the court would be prevented

from reaching that obvious holding if required to analyze each failure separately.

Proceeding in this way also creates an artificial cumulative prejudice analysis. A particular error by trial counsel may not be considered "deficient" in isolation, but it may have particularly severe consequences that would strongly support a conclusion that there was cumulative prejudice from the combination of this and other errors. If a court is precluded from considering the prejudice from that one error because the error does not quite qualify as "deficient" at *Strickland* step one, then the cumulative prejudice analysis at *Strickland* step two fails to fully account for the impact counsel's errors had on the outcome of the proceeding. If, on the other hand, a court can look at the totality of counsel's performance and determine whether it was deficient, and then assess whether the errors combined to affect the outcome, all of the potential prejudice is accounted for.

Moreover, analyzing each claim of deficient performance separately raises difficult line drawing problems, as it is often unclear at what level of abstraction each alleged failure should be defined. In this case, for example, Garcia alleges that Miller failed to elicit various pieces of exculpatory evidence from Esparza, Perez, and Worthington. Does this encompass one claim relating to a failure to elicit exculpatory evidence from prosecution witnesses? Should it be considered three claims, with each claim defined as the failure to elicit exculpatory evidence from one particular witness? Should each piece of exculpatory evidence that Miller failed to elicit—even from the same witness—form the basis of its own claim? These problems do not exist if a court can review the entirety of a trial counsel's performance and determine, considering the alleged mistakes identified by the petitioner, whether counsel performed deficiently.

The language of *Strickland* itself appears to counsel in favor of a holistic analysis.

*Strickland* instructs that the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." 466 U.S. at 689, 692. *Strickland* further instructs that "the performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances*." *Id.* at 688 (emphasis added). It is hard to conceive how counsel's performance can be assessed "considering all the circumstances" when it is done piecemeal by evaluating the reasonableness of each alleged error in a vacuum, and not in reference to trial counsel's other decisions and omissions. It is true, of course, that a petitioner pursuing an ineffective assistance of counsel claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. But the identification of specific acts or omissions should not handcuff a court into evaluating each act or omission separately. Indeed, the Supreme Court in *Strickland* held that after a defendant identifies the acts or omissions, a "court must then determine whether, *in light of all the circumstances*, the identified acts or omissions *were* outside the wide range of professionally competent assistance"—not whether each act or omission was by itself outside the range of competent assistance. *Id.* (emphasis added).

In recent years, several Ninth Circuit decisions have suggested that the deficient performance inquiry should be conducted in this cumulative way. In *Browning v. Baker*, the Ninth Circuit held that the district court improperly restricted a habeas petitioner's certificate of appealability by limiting it to include only some of the claims relating to trial counsel's alleged ineffectiveness instead of including all of the *Strickland* claims. 875 F.3d 444, 471 (9th Cir. 2017). The Ninth Circuit explained that the district court "distorted" the ineffective assistance inquiry by "separating Browning's IAC argument into individual 'claims' of IAC corresponding

to particular instances of [trial counsel]'s conduct." *Id.* The Sixth Amendment right to counsel "is a guarantee of effective counsel *in toto*," *Browning* instructed, such that courts should "consider[] counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Id.* (emphasis in original); *see White v. Ryan*, 895 F.3d 641, 645 n.1 (9th Cir. 2018) ("The district court certified only the portion of White's ineffective assistance claim regarding counsel's failure to investigate and present mitigating evidence. This was error. White has but a single claim regarding his right to the effective assistance of counsel at the penalty phase of resentencing."); *see also Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991). To the extent other circuits have suggested that courts must conduct a piecemeal analysis of counsel's performance, they are likely incorrect for the reasons discussed here. *See Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998); *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996).

But the parties in this case proceeded on a claim-by-claim basis, as did the California Superior Court. And it can hardly be said that it is clearly established Supreme Court (or even Ninth Circuit) law that courts may not analyze deficient performance in this way. Indeed, the Ninth Circuit sometimes continues to address ineffective assistance of counsel claims by deciding whether trial counsel performed deficiently with respect to each particular act or omission. *See, e.g.*, *Staten v. Davis*, 962 F.3d 487, 495-97 (9th Cir. 2020). Accordingly, this Court cannot conclude that the state trial court's approach to denying Garcia's habeas petition was unreasonable under § 2254(d).

## V.     DISCUSSION

Garcia's only hope of the jury finding him not guilty was to discredit Esparza and Worthington, both of whom named him as the third attacker and testified that he admitted to stabbing Flores. Discrediting them depended in part on bringing out any material inconsistencies

in their statements, along with any reasons they may have had for falsely accusing Garcia. In addition, because the testimony of Perez (the only other eyewitness) was somewhat in tension with Garcia being the third attacker, discrediting Esparza and Worthington depended in part on using Perez's testimony to try to convince the jury that Esparza's and Worthington's stories were inaccurate.

On this score, Miller's performance with respect to the three witnesses was deficient. For similar reasons, her failure to give an opening statement, in the circumstances of this case and considering her stated reasons for not giving one, was deficient. This is true even if one viewed Miller's performance for each witness in isolation, but obviously her performance for each witness was intertwined with her performance for the other two (and with the opening statement), and her performance with respect to all three meant that she represented Garcia incompetently. It was objectively unreasonable for the state courts to conclude that Miller's performance was adequate. However, applying AEDPA's deferential standard, it was not unreasonable for the state courts to conclude that Garcia was not prejudiced by Miller's errors.

This section first addresses Garcia's claims relating to these three witnesses, along with Miller's failure to give an opening statement. The remainder of Garcia's ineffective assistance of counsel claims, because they are insubstantial, are addressed at the end.

## A. Deficient Performance

### 1. Ernesto Esparza

Miller performed deficiently by failing to elicit information at trial that would cast doubt upon Esparza's testimony, including his prior inconsistent statements about Garcia's confession, the suggestive nature of his police interrogation, and expert testimony about the inconsistencies

between his description of the attack and the forensic findings in the autopsy report.[10] Any state court decision to the contrary was unreasonable. Esparza was arguably the main prosecution witness against Garcia and the only testifying witness who participated in the attack. He gave a detailed description of Garcia's role, directly named him as the stabber, and told the jury that Garcia confessed to him and promised to take responsibility for the crime. Impeaching Esparza's testimony was critical to Garcia's defense.

As to Esparza's prior inconsistent statements about Garcia's confession, Miller failed to use even a single one to impeach Esparza's trial testimony that Garcia repeatedly and explicitly confessed to being the one who stabbed Flores. This testimony was either directly inconsistent with or largely absent from the first police statement Esparza gave about a week after the attack. (Esparza's second statement, which he gave after he decided to testify for the prosecution, largely paralleled his trial testimony.)

At trial, Esparza testified that Garcia explicitly confessed to "stabbing" Flores. During his first interrogation, Esparza initially said that he "figured" Garcia was the stabber but that Garcia "didn't actually verbally tell" him that, and later said that Garcia didn't confess "directly" to Esparza but implicitly confessed by saying "I got that fool" out loud.

At trial, Esparza testified that Garcia confessed to him at the drive-in. In his first interrogation, Esparza initially said that Garcia confessed when they were drinking outside Daniel Lechuga's apartment, and later said that Garcia confessed when they were "smoking a

---

[10] Although Garcia separated his claim relating to Esparza's cross-examination from his claim relating to expert forensic testimony, Miller's actions with respect to the forensic expert are entwined with the broader question of whether Miller performed deficiently by failing to adequately undermine Esparza's testimony. This is just one example of the problem with evaluating deficient performance piecemeal as some courts do—the lines between each supposedly distinct ineffective assistance of counsel claim are often difficult, if not impossible, to draw.

cigarette down by the carport."

At trial, Esparza testified that Garcia told him he stabbed Flores because he was "mugging him or something like that." This statement was absent from Esparza's first interrogation.

And at trial, Esparza testified that when they learned Flores had died, Garcia said he was going to take responsibility for the murder by telling his friends "I'm going to take it" and "you guys have nothing to worry about." This too was absent from Esparza's first interrogation.

The jury never heard about any of these inconsistencies, and Miller's failure to use them to impeach Esparza, both to cast doubt on his general credibility and to undermine the specific story he told about how Garcia confessed to him, constituted deficient performance. *See Floyd v. Filson*, 949 F.3d 1128, 1143-44 (9th Cir. 2020) (recognizing that constitutionally deficient cross-examinations occur when "there were glaring failures to ask even basic questions"); *see also United States v. Tucker*, 716 F.2d 576, 585 (9th Cir. 1983) ("[Trial counsel's] most serious dereliction of duty during trial, however, was the failure to utilize any of the prior statements given by government witnesses."). There was "no reasonable justification for failing to make use of the crucial witnesses' prior inconsistent statements." *Raether v. Meisner*, 608 F. App'x 409, 414 (7th Cir. 2015). This is especially true where, as here, the prior inconsistent statements related to Garcia's alleged confession, as "[c]onfessions are indisputably damning evidence." *Doody v. Schriro*, 548 F.3d 847, 869 (9th Cir. 2008).

Miller did bring out some of the other inconsistencies in Esparza's statements unrelated to Garcia's confession. For example, Miller elicited testimony about how Esparza first told the police about Garcia throwing the knife into the creek only *after* Esparza heard Worthington tell that story during her conditional examination. Miller also elicited from Esparza testimony that he

lied to the police in his first interrogation about topics such as his nicknames, his tattoos, his whereabouts the night of the stabbing, and his familiarity with the area where the stabbing took place. But eliciting this inconsistency and the lies about these topics did not obviate the need to impeach the story Esparza told at trial about how Garcia confessed to stabbing Flores.

As to the context of Esparza's statements to the police, Miller performed deficiently by not bringing out on cross-examination the veiled threats that the police officers made to Esparza and the suggestive nature of some of their questions. Miller needed to give the jury a reason to doubt Esparza's testimony and a reason to think that Esparza falsely named Garcia as the stabber. The suggestive manner in which the police solicited information from Esparza during his first interrogation could have helped to accomplish that.

Specifically, during Esparza's interrogation, the police repeatedly implied that Esparza had to name Garcia as the person who stabbed Flores or Esparza himself would be on the hook for it. For example, the police gave him the following warnings: "you gotta get in front of it because I'll tell you right now if you don't get in front of it, then what ends up happening is the house comes crashing down on you, okay?"; "Ralphy stab the guy? . . . you were there, man, and this is gonna be the chance you get to tell your side of this thing. This might be the only chance you get to tell your side of this thing"; "Ralphy started this, it sounds like, right? . . . You want to put the rest of your life in Ralphy's hands here, man? . . . Well, then it's time to think about yourself"; "You need to defend yourself, man . . . So far it wasn't the dude you were in the car with that stabbed him. It was either you or it was Ralphy . . . How do we know it wasn't you? . . . The only way we're gonna know it wasn't you is if it was somebody else." To be sure, these kinds of admonitions do not (contrary to Garcia's suggestion) rise to the level of "coercion" in the legal sense of the word. But it does not follow that a defense lawyer can't make

good use of them at trial. These statements—particularly the one in which an officer insisted that the stabber had to be either Esparza or Garcia—certainly could have been used to argue that Esparza falsely named Garcia as the stabber to protect himself (or to protect someone else, such as Raymond or one of the Lechuga brothers).

Towards the end of the first interrogation, Esparza told the police that Garcia confessed to stabbing Flores, and the context of this statement is another key aspect of the police questioning that Miller failed to use. At this late point in the interrogation, Esparza had only told police that he "figured" Garcia stabbed Flores, but that Garcia never actually "verbally" told him that. The following exchange then took place—an exchange that Miller could have portrayed as the police putting details into the mouth of an exhausted detainee:

Officer: Who first told you this guy got stabbed?

Esparza: Fuck, I don't even remember. I don't remember.

Officer: Sure you do, man. Come on. That's pretty big news.

Esparza: It's news that I forget, like I don't want to remember. Why would I want to remember –

Officer: You need to remember. Come on, Ernesto. If one of my buddies just told me that, uh, that they stabbed somebody, even if I wanted to suppress that, that's just imprinted in my mind.

Esparza: You think I could get my sock? My – my foot is freezing.

Officer: In a minute.

Esparza: Uh, Ralphy told me. He told me like, yeah, he told me what happened . . .

Officer: Where were you when he told you?

Esparza: Uh, back drinking.

Officer: Inside Daniel's apartment?

Esparza: Not inside. Uh, I believe it was outside.

Officer: Like by the carport or –

Esparza: 'Cause I was – I mean I was drunk, man, and everything's faded.

Officer: By the carport or by the (*)?

Esparza: I mean I'm exhausted right now, you know, just like -

. . .

Officer: Where were you when Ralphy told you he stabbed the dude?

Esparza: I had seen Ralphy right after, like right after. Like he had said it, but didn't say it directly to me, you know. He just said it out loud.

Officer: Uh-huh.

Esparza: That's when I was just like damn.[11]

Officer: What did he say? Ernesto, what did he say?

Esparza: Uh, I got that fool.

Officer: I got what?

Esparza: I got that fool.

Officer: I got that fool? What does that mean?

Esparza: I don't know. Well, I figured – I don't know. You know, he could have meant a number of things by it.

Officer: Why did you think he meant stabbed?[12]

Esparza: I don't know. Because – I don't know. He probably wouldn't have said that if he, you know, beat him up. Maybe he could have meant that, but I just figured that, you know. It's what I – I mean people take lingo different ways.

. . .

Officer: And where were you guys at really when he tells you this?

---

[11] In the written transcript, this appears as "Esparza: That's when I was just like (*)."
[12] In the written transcript, this appears as "Officer: Why do you think he (*) stabbed?"

Esparza: Huh?

Officer: Where are you guys at really when he tells you this?

Esparza: I don't know what else it is you guys – you guys –

Officer: Just ans – we'll wrap it up.[13]

Esparza: I mean come on. I mean yeah, we're gonna wrap it up. I mean I'm tired and it's already late. I just really want to just go to bed. That's all I want right now, I mean.

. . .

Esparza: I just really want to just go to bed. I mean I just – just, I mean, I just really want to go to bed. I'm – I'm just tired of this. I just – I really don't want to put up with this no more. I told you, I mean, what I know. I mean you guys are trying to, you know, get me to, you know, cook up a new story or something I –

Officer: No, we're not. No, we're not. Here's – here's the deal. There's a little piece of this –

Esparza: You just want me to lie to you or something?[14]

Officer: Well, no. There's – there's little pieces of this that we just – that we want to get out. There's little pieces that we don't know and, like my partner said, that we've gotta hear from you because –

Esparza: What is it that you guys need to hear from me?

Officer: – you had, you had involvement in it. Where were you when Ralphy told you he stabbed him?[15]

Esparza: I was, uh – I was, uh, outside smoking a cigarette down by the carport.

A jury hearing this exchange, during which Esparza reluctantly provides details about how Garcia confessed to stabbing Flores, including ultimately saying Garcia confessed at the place first suggested by the officer a few minutes earlier ("by the carport"), could have had reason to

---

[13] In the written transcript, this appears as "Officer: (*) and we'll wrap it up." Watching the video of the interview makes clear that the officer starts to say "Just answer" before stopping himself mid-word and interjecting with "we'll wrap it up."

[14] In the written transcript, this appears as "Esparza: You just want to (*) or something?"

[15] In the written transcript, this appears as "Officer: You haven't – you haven't told me that."

question Esparza's testimony. Together with the threats the police made to convey to Esparza that if he did not name Garcia as the stabber he would take the fall for Flores's murder, this was evidence Miller could have used to cast doubt upon Esparza's testimony generally and the nature of Garcia's supposed confession specifically. But Miller failed to bring out any of this.

Miller also failed to elicit from Dr. O'Hara any testimony about whether, in his expert opinion, Flores's stab wounds were inconsistent with Esparza's description of Garcia's actions. Instead, Miller chose to make that point only in her closing argument by asserting that Dr. O'Hara's description of the forensic evidence was irreconcilable with the story Esparza told. But as the Superior Court recognized in rejecting this claim based on prejudice alone, an expert's testimony has different weight than statements made by lawyers during closing, which, of course, are not evidence that the jury can properly consider, as the jury here was specifically instructed. Reporter's Transcript of Trial, Dkt. No. 14-2, at 847 ("In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witness' answers are evidence."). Miller was not, contrary to Garcia's assertion, required to call her *own* expert to opine that the autopsy report did not support Esparza's version of events, but there was no reason to try to make that point herself instead of eliciting it from the prosecution's expert who, by all indications, would have been fully able to provide it. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) ("Expert evidence is necessary on such issues when lay people are unable to make a reasoned judgment alone."). Miller's failure to bring out this readily available opinion testimony, which went to the critical issue of whether Esparza was truthfully implicating Garcia as the stabber, constituted deficient performance. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) (recognizing that in certain instances "defense counsel's failure to present expert testimony" may constitute

deficient performance).

*Strickland* commands that trial counsel be afforded a wide latitude in choosing trial strategy and tactics, but a nearly wholesale failure to challenge the government's star witness—with impeachment evidence that was readily available—is outside the range of professionally competent assistance and reflects no reasoned professional judgment. *See Strickland*, 466 U.S. at 690. The implicit state court conclusion to the contrary is an objectively unreasonable application of *Strickland*.[16]

### 2. Sonia Perez

Miller performed deficiently by failing to elicit Perez's prior physical descriptions of the third attacker that cast doubt on the notion that this person was Garcia, and it would have been unreasonable for the state court to conclude otherwise. At trial, Perez gave only general testimony that the third attacker was short, and stated that even though the attacker stood between her and Flores, she could see Flores's head over the attacker because Flores was so much taller. (The record establishes that Flores was six feet tall.) Perez also testified that the third attacker was wearing a black hooded sweatshirt.

Given the importance of the only neutral eyewitness's testimony describing the third attacker, and given that some of Perez's other statements furthered Miller's defense that the third

---

[16] Garcia also argues that Miller performed deficiently when cross-examining Esparza by failing to elicit the following information: (a) Esparza's relationship with Raymond and efforts during his police interrogation to downplay Raymond's involvement in the attack; (b) Esparza's understanding of the impact of his plea agreement; (c) Esparza's relationship with the Lechuga brothers, which may have motivated him to shift blame away from them and towards Garcia; and (d) Esparza's statement to police that he did not hear Garcia yell "Norte" during the attack. As to this last claim about not hearing "Norte," this will be addressed below in connection with Miller's handling of Worthington. As to the former three claims, the state court could have reasonably found that Miller did not perform deficiently. The information Miller failed to elicit was either duplicative of other information that came out at trial, or was relatively insignificant in the scheme of trial evidence.

attacker was Daniel or Jose Lechuga, it was a failure on Miller's part to leave it at that. *See Staten*, 962 F.3d at 496 ("[Counsel]'s choice not to make use of readily available evidence, from apparently disinterested witnesses, that would have enhanced his chosen defense theory was unreasonable."). Perez, during her interviews with the police, gave a fairly detailed physical description of the third attacker that was at odds with Garcia's appearance. She said the third attacker was 5'4", while Garcia was 5'10". She said the third attacker weighed about 130 pounds, while Garcia weighed about 160 pounds. She said the third attacker was wearing dark colored shorts, while Garcia was wearing beige pants in the liquor store videos. She said at one point that the third attacker was bald with his hair just starting to grow out and at another point that the attacker was wearing a black hat, while Garcia had a full head of hair and was not wearing a hat in the liquor store videos. Finally, Perez stated during her police interview that she could not see the third attacker's face in part because it was blocked by the hood of his sweatshirt, while Garcia was wearing a t-shirt (with no hood).

All these statements would have helped Miller's argument that the third attacker was not Garcia, and many of them furthered Miller's defense that the third attacker was Daniel or Jose Lechuga. On the liquor store video recordings from the night of the attack, Daniel was wearing a black hat and Jose was wearing a black hooded sweatshirt. Both appear shorter than Garcia in the video, and the record establishes that Jose was 5'6" (four inches shorter than Garcia, and six inches shorter than Flores). But Miller did not bring out Perez's prior statements about the attacker's weight, shorts, or hair style. And with respect to the attacker's height and hooded sweatshirt, Miller merely asked Perez to confirm her general testimony that the attacker was short enough that Perez could see Flores's face over the attacker's head, and that he was wearing a hooded sweatshirt. It was objectively unreasonable for her to not do more.

50

Garcia also argues that Miller performed deficiently by failing to ask Perez, either at trial or during the pre-trial investigation, about her purported identification of the three attackers in the liquor store videos. This argument appears compelling at first glance. Perez's statements that it "could have been them three" and "those are the three of them" appear initially exculpatory because at the time Perez makes these identifications, she is looking at a part of the video where Esparza and Raymond are standing with someone who is not Garcia.[17] However, the only reasonable interpretation of these statements in context is that Perez immediately recants her statement about the "three" of them and corrects it by saying that only "two" of the three men in the video (Esparza and Raymond) were involved in the attack:

> Perez: Like to me, if you ask me, I think those are the three of them.

> Sergeant: Okay.

> Detective: So, you think that the guy with the hat is the guy that –

> Perez: I think it's these two.

> Detective: Okay.

> Perez: But not that one.[18]

> Detective: And you think, you think this is the guy that followed the victim out and then confronted him or no?

> Perez: No.

> Detective: Okay, so you think these are the two guys that were sitting in the car?

> Perez: Cause this guy's fatter. The guy that talked to him was skinny.

Perez immediately clarifies that she does not think the three guys appearing in the video are the

---

[17] Although Perez makes these two statements a few minutes apart, it seems almost certain that she is looking at the same three people because the police rewind the video between the two statements and she is re-watching the same clip when she makes the second statement.
[18] In the written transcript, this appears as "Perez: (*)."

three attackers because the third guy (the one who is not Esparza in the red 49ers jersey or Raymond in the red hat) is "fatter" than the third attacker. As described above in footnote three, it also seems almost certain that this exchange occurs while Perez is watching the end of the Channel 4 recording, at which point the three people in the video are Esparza, Raymond, and Jose Lechuga. Garcia appears visibly skinnier than Jose Lechuga in the liquor store video recordings (and the record establishes that Jose was about four inches shorter and weighed about five pounds more than Garcia). In context, the only reasonable interpretation of this exchange is that Perez initially identifies Esparza, Raymond, and Jose Lechuga as the three attackers, but quickly makes clear that Jose is not the third attacker because the third attacker was skinnier. Perez's statements are not exculpatory, and indeed would have undermined Miller's defense that the third attacker was Jose Lechuga, so a state court could reasonably conclude that Miller performed adequately by not eliciting these statements or asking Perez about them.[19]

### 3. Lauren Worthington

Miller performed deficiently by failing to convey to the jury the high-pressure, suggestive nature of Worthington's police interview. It was crucial for Miller to give the jury a reason to doubt Worthington's testimony—if believed, her testimony alone would likely be enough to convict Garcia. The prosecution argued as much in closing. There was thus no strategic reason for Miller to not use every tool at her disposal to undermine the statements Worthington made, including the aspects of the police questioning that could have allowed the jury to question whether the police pressured Worthington into naming Garcia as the stabber and fed her information that she then regurgitated back to them.

---

[19] Garcia also argues that Miller performed deficiently by failing to elicit Perez's statement that she did not hear anyone yell "Norte" during the attack. This will be addressed below in connection with Miller's handling of Worthington.

For example, the police gave Worthington not-so-veiled warnings such as "when you are involved or even on the sidelines of something of this magnitude, then it can reach a lot of people and a lot of people can get in trouble for it"; "do me a favor, please, don't risk your life and everything that you have going for you, for someone else"; "you have your whole life ahead of you"; "you're obviously present at a homicide . . . and you left the scene . . . and you gave him a ride . . . and he's wanted . . . and he's staying up at your house . . . we know you guys talk"; "don't throw everything away because of someone else's mistakes"; "you need to tell us about the knife and we need to hear it out of your mouth, not from what we know"; "you're trying to keep yourself as distanced – distant as possible [from what happened], but that's not the case anymore. You can't. He – he sucked you into this . . . And now you need to get yourself out of it"; and "it's important that you don't get caught up in something." On the audio recording of the police interview, Worthington also sounds notably upset and can be heard sniffling. As with the police's treatment of Esparza, these comments do not rise to the level of legal "coercion." But a jury hearing the comments and Worthington's audible distress, while also knowing that Worthington faced police questioning as a young, pregnant woman, would have reason to doubt her testimony. The jury never heard any of this because Miller failed to bring it out during cross. In fact, the only audio clips from Worthington's police interview that the jury heard were selected and played by Raymond's lawyer, who had an obvious incentive to play the portions of Worthington's testimony that incriminated Garcia.

For some parts of the interview, Miller could have raised the concern that the police went so far as to put words into Worthington's mouth. The most prominent example involves Worthington's statement to the police that she heard Garcia yell "Norte" while attacking Flores. When the detectives first asked Worthington what the attackers were yelling, she responded "I

don't know." About two minutes later, the following exchange occurred:

Detective 1: Have you heard him claim obviously –

Worthington: Huh-uh.

Detective 1: - being in some clique?[20]

Worthington: I mean I've heard him say it before, but that was it.

Detective 1: What has he said? What did he say?

Worthington: Just yelled out Norte and that was it.

Detective 1: Okay.[21]

Worthington: What they all do.

Detective 1: Yeah. (*).

Detective 2: Just (*) just yelling it out?

Worthington: (*). And he'll just say it sometimes.

Detective 1: When they were fighting that night –

Worthington: Uh-huh.

Detective 1: – did you hear him say it? Be straight with us.

Worthington: He might – he might have said it. That's when I told you I heard yelling, but I don't know if I actually heard that. It might have been. I don't - like I said, I don't know. I just heard him say something, then this, this, and then it just went altogether and was over with.

Detective 2: Did it sound like Norte?

Worthington: Kind of, yeah, but it was more of – I mean it was more of not too loud either at the same time, so it was like I couldn't really hear too much, but I heard that one yell and that was it.

Detective 1: And what was that one yell?

_____

[20] In the written transcript, this appears as "Detective 1: - being in some (*)?"
[21] In the written transcript, this appears as "Detective 1: (*)."

Worthington: I – um, what you guys said, I guess. I don't know. Like I said, I heard little bits of it.

Detective 1: But at least that one yell, what do you think that one yell was?

Worthington: I'm pretty sure it was that.

Detective 1: What?

Worthington: Norte.

Detective 1: Okay.

A jury hearing this full context, much like with the police warnings described above, would have a reason to question whether Worthington's testimony on this point was based on her own memory or on the information fed to her by the police.[22] As with the veiled threats, there was no strategic reason to not use this information to cast doubt on Worthington's statement, which went to the issue of establishing that Garcia had a motive to attack Flores (and that the murder was subject to a gang enhancement penalty). More generally, arguing that the police cajoled Worthington into saying that she heard Garcia yell "Norte" would have been a springboard for arguing that other aspects of Worthington's testimony were also the product of suggestive questioning. Miller's failure to do this was objectively unreasonable and unsupported

---

[22] Miller's failure to elicit from either Esparza or Perez that neither of them heard anyone yell "Norte" during the attack was part of this broader failure to attempt to show that the police put words (such as "Norte") into Worthington's mouth. As to Esparza's credibility or Perez's description of the third attacker, these statements had minimal value. But they had significant value as they related to the argument Miller failed to make that the police fed Worthington information and cajoled her into making certain statements. Specifically, Esparza told the police during his second interview in February 2012 (after he had already agreed to testify for the prosecution) that he didn't remember hearing anyone yell "Norte" during the attack. During Perez's interviews with the police, she never mentioned hearing anyone yell "Norte," despite telling them she was close enough to hear Raymond punch Flores's face, and close enough to hear Flores hit the ground when he fell. Miller performed deficiently by not eliciting these statements for the same reasons she performed deficiently with respect to Worthington—she failed to make any attempt to show that the police put words into Worthington's mouth, which would have cast doubt on Worthington's testimony both generally and as to the "Norte" statement specifically.

by any conceivable tactical explanation.[23]

### 4. Opening Statement

Miller also performed deficiently by failing to give an opening statement. She explained her decision as follows: First, she said that Garcia told her inconsistent stories about what happened the night of the attack, preventing her from preparing an opening based on one coherent theory, and making her concerned about locking the defense into one version of events. Second, she said that in gang cases, witnesses often change their stories or fail to testify as expected, such that she did not want to promise testimony that witnesses would later fail to deliver. And third, she said that the value of opening statements is generally "overstated," and she only gives one when it provides a strategic advantage. Determining whether Miller's decision to not give an opening constituted deficient performance requires examining these stated reasons, without hypothesizing about other possible explanations. *See Hernandez v. Chappell*, 923 F.3d 544, 550-51 (9th Cir. 2019). The Superior Court explicitly addressed and rejected this claim, crediting Miller's decision to not give an opening based on Garcia's

---

[23] Garcia argues that Miller performed deficiently with respect to Worthington in two other respects, both of which could be reasonably rejected by the state court. First, Garcia argues that Miller should have elicited Worthington's statement during her first police interview that she didn't "even give a shit" about Garcia. This was an insignificant omission in light of the other testimony Miller did elicit that Worthington was "furious" with Garcia at the time of the interview because she had just found out that he slept with another woman. Second, Garcia argues that Miller should have used letters Worthington allegedly sent to Garcia while he was in jail apologizing for exaggerating her story to the police. The record is unclear about what exactly happened with these letters. Garcia asserts that he gave them to Miller to use in his defense, and that she then failed to use them and never returned them. During her cross-examination, Miller does refer to letters of some sort, getting Worthington to confirm that she was "writing [Garcia] love letters over at the jail." But the letters themselves were never produced in postconviction proceedings, nor have the parties pointed to any other mention of them in the record. And although there is evidence that Miller had a troubling habit of not preserving her notes and being obstinate in her production of documents to post-conviction counsel, Garcia has not met his burden, on this record, to show that Miller performed deficiently by failing to use the letters.

inconsistent statements about what occurred, and finding that it was a "tactical choice informed by counsel's 26 years of experience defending in gang cases." *In re Ralph Anthony Garcia*, Case No. CC941517, at *3-4.

It is true that the decision to give an opening statement is "ordinarily" a question of trial tactics that will not constitute deficient performance. *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985). But it does not follow that the failure to give an opening statement can *never* be deficient performance, especially when the reason trial counsel provides for not giving one makes no sense in the context of the case. *See Stouffer v. Reynolds*, 214 F.3d 1231, 1233 (10th Cir. 2000).

And in the context of this case, Miller's explanation made no sense. As discussed, the prosecution's entire case hinged on Esparza and Worthington, both of whom directly implicated Garcia as the one who stabbed Flores, and both of whom told the police that Garcia confessed to them. Any defense Miller mounted—regardless of what else she said or what other witnesses she would offer—necessarily depended on discrediting the testimony of Esparza and Worthington. Using her opening statement to cast doubt on the reliability of these witnesses before the jury heard them, by describing the inconsistencies in the statements they had given to police and by explaining the reasons they might have for falsely accusing Garcia, did not depend on Garcia giving a coherent story about what occurred the night of the attack or on the follow-through of other witnesses. Giving this kind of opening statement depended only on Miller doing her homework and knowing these witnesses' weaknesses.

Similarly, Miller could have used her opening statement to highlight the physical descriptions of the third attacker given by Perez, the only neutral eyewitness, that were inconsistent with Garcia's physical description and with the clothes that he was wearing on the

night of the attack. As with the impeachment evidence relating to Esparza and Worthington, introducing the jury to this evidence during opening statement did not depend on Garcia's version of events or the testimony of possible defense witnesses.

Garcia's expert on the standard of care for a first-degree murder defense in Santa Clara County—a defense lawyer with 35 years of experience and the current supervisor of the homicide team at the Santa Clara County Public Defender's Office—made this point during the evidentiary hearing on Garcia's habeas petition: a defense attorney can "take apart the prosecutor's case in opening statement" without committing themselves to a particular story, and any prepared lawyer will know what the holes in the government's case are before the start of trial and can use the opening statement to exploit them.

Moreover, Miller's explanation of her opening statement practices suggest that her decision to not give an opening statement here was less a matter of strategy specific to Garcia's case and more a reflection of a broader policy rooted in her belief that opening statements are unimportant. Miller made the rather startling statement that she waives opening in about 60% of her cases, and that she thinks opening statements are not particularly valuable because juries tend to not like them and not remember them. This contradicted testimony from Garcia's *Strickland* expert that defense attorneys should give opening statements in murder trials "without exception," and that recent social science research suggests that opening statements are crucial. This is an overstatement by Garcia's expert—there are always exceptions to general rules of strategy, and occasionally waiving opening is a better strategic choice. But his opinion approximates the prevailing professional view far more closely than Miller's. For example, the current American Bar Association criminal justice standards provide that defense counsel "should be aware of the importance of an opening statement and, except in unusual cases, give

an opening statement immediately after the prosecution's, before the presentation of evidence begins." Criminal Justice Standards for the Defense Function, Standard 4-7.5(a) (Am. Bar Association 2017 4th ed.). *Strickland* requires courts to measure attorney performance under "prevailing" professional norms. 466 U.S. at 688, 690. Current thinking, grounded in social science research, suggests that only a bad lawyer would have a general policy of waiving opening statements, and this casts doubt on older cases that take an outdated view on the importance of openings and give extreme deference to defense lawyers on this issue. *See, e.g.*, *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993); *Rodriguez-Ramirez*, 777 F.2d at 458 (1985); *United States v. Salovitz*, 701 F.2d 17, 19-21 (2d Cir. 1983); *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965). And anyway, with respect to Miller specifically, her decision to waive opening statement in this case can hardly be credited as a reasoned, strategic decision based on Garcia's particular circumstances when she admitted that not giving opening statements was her default policy, and when the reasons she gave for that policy had nothing to do with what she needed to accomplish in the case at hand.

### B. Cumulative Prejudice

To obtain relief, Garcia must also show prejudice—meaning that "absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. And in the federal habeas context, it is not enough for Garcia to make a strong case on prejudice. He must show that it was objectively unreasonable for the state courts to conclude that there was no prejudice. *See Richter*, 562 U.S. at 105. The prejudice resulting from Miller's multiple deficiencies is analyzed in the aggregate, considering all of the things she should have done to perform competently. *See White*, 895 F.3d at 671.

The deficiencies in Miller's performance can be summarized as follows: (i) she failed to

bring out Esparza's inconsistent statements to the police about the circumstances of Garcia's confession; (ii) she failed to bring out the suggestive nature of Esparza's interrogation and the context in which he provided information to the police; (iii) she failed to highlight Perez's multiple, specific statements describing the third attacker in a way that was inconsistent with Garcia; (iv) she failed to show how the police suggestively questioned Worthington while repeatedly conveying that she would be in trouble if she didn't implicate Garcia, sometimes going so far as to put words in her mouth; and (v) she waived opening statement rather than using it to sow doubt about Garcia's involvement (and the extent of his involvement) by discrediting Esparza and Worthington and highlighting Perez's descriptions of the third attacker. These errors were serious and inexcusable; there is a strong argument that they were indeed prejudicial. But fairminded judges could disagree about whether there was a reasonable probability of a different outcome had Miller performed adequately.

Perhaps if the only question at trial was whether Garcia actually stabbed Flores, any reasonable judge would be compelled to conclude that Miller's deficient performance affected the verdict. Many weaknesses in the prosecution's case went to that specific question—for example, Esparza's inconsistent statements, in response to suggestive police questioning, about the manner in which (and the location at which) Garcia confessed to being the stabber. But whether Garcia actually stabbed Flores was not the only question at trial. The prosecution presented a theory of aiding and abetting that did not depend on Garcia being the stabber. And it's clear from the record that one or more of the jurors was heavily focused on this theory— recall that the trial judge received multiple questions from the jury on this issue, including a specific question about whether they could find Garcia guilty of murder even if he was not the one who stabbed Flores. Under an aiding and abetting theory of guilt, some of the vulnerabilities

in the prosecution's case fall away.

For example, it was clear from the record that Garcia was present the night of the attack, and was hanging out with Esparza and Raymond a short while before the attack took place. Nor was there evidence, either presented at trial or identified by Garcia in his habeas petition, to contradict the testimony that he got into Worthington's car before the attack, left her car, and then got back into her car after the attack. On this evidence alone, it would not have been a huge leap for the jury to conclude that Garcia participated in the altercation.

Moreover, a jury that heard the evidence Miller should have presented could still have concluded that although Esparza may have been lying about Garcia being the stabber, he was not lying about Garcia being the third attacker. After all, Esparza had blood on his jersey, and the police put him to the choice: "it was either you or it was Ralphy." The most logical conclusion is that Esparza (if he was lying) sought simply to shift blame for the stabbing from him to another attacker, rather than making up an entire story about who the third attacker was.

It also bears recalling that the statements of Esparza and Perez were consistent, on a general level, regarding the initial confrontation between Flores and the third attacker. Perez described the third attacker effectively squaring up with Flores in the parking lot outside the liquor store before Esparza and Raymond ran over. Esparza, during his first interrogation with the police, described seeing a man get in Garcia's "face" across the parking lot and seeing the two exchange words before he and Raymond went over. That these two witnesses, who we have no reason to think colluded to fabricate a story, described the conduct so similarly suggests that Esparza was not making this part up.

With respect to Perez, it's true that her various statements describing the third attacker could have caused the jury to doubt that it was Garcia. On the other hand, it is not uncommon for

witnesses to get details wrong even when their testimony is accurate in the big picture. The jury here was instructed, as juries commonly are: "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently." Reporter's Transcript of Trial, Dkt. No. 14-2, at 345. The attack took place at night, and was no doubt traumatic; Perez was still visibly rattled while talking to police later that evening, especially after learning that Flores, who she knew from the area because they both had daughters around the same age, had died. Under the circumstances, the jury might have treated Perez's specific statements about the third attacker's appearance as not particularly reliable, even as it found her overall narrative reliable. And it's not as if the jury heard nothing about the inconsistencies between Perez's description of the third attacker and Garcia's physical appearance—although Miller did a bad job of bringing out the details, the jury heard that the third attacker was significantly shorter than Flores and wearing a hooded sweatshirt.

To the extent that Perez's descriptions would have caused the jury to wonder if the third attacker was Jose or Daniel Lechuga, other evidence introduced at trial made that theory problematic. Jose Lechuga's girlfriend was sisters with Flores's common law wife (the mother of Flores's daughter). Jose was seen hugging Flores's wife on the liquor store videos a short while before the attack took place. Flores's wife testified at trial that Jose knew Flores and would recognize him by sight. Presumably Jose also knew he was not a rival Sureño gang member. So even if the jury heard Perez describe the third attacker as someone more closely resembling one of the Lechuga brothers, it would have had other reasons to doubt that one of them initiated the attack on Flores.

In sum, there was a good deal of evidence that Garcia was involved in the attack. This general evidence about his involvement was more reliable than the specific evidence that he was the stabber. Thus, even if correcting Miller's performance would have cast significant doubt on a conclusion that Garcia was the one who stabbed Flores, it would not have been objectively unreasonable for the state courts to conclude that her incompetence did not make a difference with respect to the jury convicting on an aiding and abetting theory. This precludes Garcia from obtaining federal habeas relief.

### C.  Other Claims of Ineffective Assistance

As previously mentioned, Garcia attacks Miller's performance in many other ways. These remaining arguments are too insubstantial to contribute meaningfully to his habeas petition. For each of them, either Miller performed adequately or the deficiency was too minor to factor into a cumulative prejudice analysis. Those issues are discussed briefly here.

#### 1.  Closing Argument

Garcia argues that Miller provided ineffective assistance during closing argument by (a) failing to mention the concept of reasonable doubt or explain what that burden of proof entails, and (b) arguing that "guilty people change their clothes" after Worthington testified that Garcia told her he changed his shirt after the attack. As with many other aspects of Miller's representation, it is obvious that Miller put minimal thought or effort into her closing. This was exemplified by the winding, irrelevant, and borderline incoherent anecdote she told about her husband's friend's poodle. Perhaps even more bizarre were her comments—in a case where she needed to raise concern that the police were putting words in the mouths of witnesses—praising the police for conducting such a thorough and careful investigation. But Garcia does not raise those particular aspects of her closing in this petition, and the arguments Garcia did make

regarding the closing argument could have been reasonably rejected by the state courts. Specifically, it was not unreasonable for the Superior Court to conclude that Miller did not need to mention reasonable doubt because she "pointed out the deficiencies in the evidence from which the jury could have concluded reasonable doubt existed" and "the entire thrust of her argument was reasonable doubt." *In re Ralph Anthony Garcia*, Case No. CC941517, at *4-5 (citing *Yarborough v. Gentry*, 540 U.S. 1 (2003)). As to Miller's comment that "guilty people change their clothes," the comment was made in the context of discussing Esparza taking off his bloody 49ers jersey. It was a foolish comment to make given Worthington's earlier testimony about Garcia taking off his shirt, and reflective of Miller's general lack of preparation and cavalier approach. But in the grand scheme of the evidence discussed in this ruling, Worthington's testimony that Garcia changed his shirt was inconsequential.

## 2. Jessica Martinez

Garcia argues that Miller provided ineffective assistance by failing to call Jessica Martinez as a witness. Martinez and Garcia have a child together. She was his second girlfriend at the time of the attack and was still his girlfriend at the time of trial. Martinez asserts that she would have testified that when she picked Garcia up around 7 a.m. on the morning after the attack he was wearing the same clothes he had on when he left the day before—a black t-shirt and khaki-colored pants. Garcia argues that Martinez's testimony would have undermined Worthington's statement that Garcia changed his clothes after the attack, serving to further discredit Worthington, as well as help prove that Garcia did not have a guilty mindset.

It was not unreasonable for the state courts to reject this claim given that Miller's stated reason for not calling Martinez was that she was not credible. *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995); *cf. Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999). Miller

based this conclusion on two statements that Martinez made: first, that Garcia had no tattoos, when Garcia was in fact tattooed (Martinez, having been intimate with Garcia, should presumably know this); and second, that Garcia was not associated with gangs, when there was abundant evidence connecting him with gang paraphernalia. Moreover, although Miller herself did not personally interview Martinez, and relied on her investigator's report to assess her demeanor, the decision to not call her was not deficient given the anticipated problems with her testimony and its relative unimportance. And for similar reasons, even assuming Miller performed deficiently by not interviewing Martinez, Garcia suffered no prejudice from this omission because the value of the proffered testimony was minimal at best.

### 3. Not Objecting to Prosecutorial Misconduct

Garcia argues that Miller performed deficiently by not objecting to statements made by the prosecutor during his closing argument. Specifically, Garcia asserts that Miller should have objected at three points. First, when the prosecutor asked the jury to sympathize with Flores, making statements such as "this could happen to anyone," "anyone could be" the victim, and "it could have been anyone." Second, when the prosecutor described Garcia and other gang members as morally inferior, stating "it's not respect that we should give [Garcia] as a civilized society, but rather condemnation"; that gang members "run around with their own little . . . uncivilized world, uncivilized society"; and that Garcia "earned the condemnation of our society and the members of our community who sit here on behalf of our community." Finally, when the prosecutor inserted his own beliefs and experiences into closing argument, stating, "When I first started doing gang cases in particular, it dawned on me that this is irrational, irrational behavior from a subset of our society . . . I had an expert explain it to me, and I thought this poor expert is explaining to me an irrational set of behaviors to an ignorant

individual who has no idea what actually is going on with these people."

The state court could reasonably conclude that Miller's failure to object to these statements did not constitute deficient performance. Some or all of the prosecutor's statements were almost certainly improper, and Miller may have succeeded in having them stricken if she had objected. *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) ("The prosecution, to be sure, may not urge jurors to identify individually with the victims with comments like '[i]t could have been you' . . . ."); *United States v. Witherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking." (quoting *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994))); *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence."). But the comments do not rise to the level of "egregious misstatements" to which defense counsel must object or be found to have performed deficiently. *See United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993); *cf. Zapata v. Vasquez*, 788 F.3d 1106, 1110-11 (9th Cir. 2015).

### 4. Jury Instruction on Voluntary Intoxication

Finally, Garcia argues that Miller performed deficiently by failing to object to the voluntary intoxication instruction that was given to the jury, and by not requesting an alternative voluntary intoxication instruction that would have allowed the jury to consider evidence of intoxication with respect to aiding and abetting liability. The instruction that was given, CALCRIM 625, provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. . . . You may not consider evidence of voluntary intoxication for any other

purpose." An alternative instruction, CALCRIM 404, authorizes the jury to consider a defendant's voluntary intoxication in the broader context of aiding and abetting liability: "If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant: A. Knew that [the perpetrator] intended to commit [the offense]; AND B. Intended to aid and abet [the perpetrator] in committing [the offense]." The trial court also instructed the jury on general aiding and abetting liability.

The California Court of Appeal rejected this claim on direct appeal. The court held that Miller "made a tactical decision" to argue that Garcia was not involved in the attack at all, such that requesting a voluntary intoxication instruction relating to aiding and abetting liability "would have been inconsistent" with her defense, and Miller should not be faulted for not pursuing "two wholly inconsistent defenses." *Garcia*, 2014 WL 667483, at *11.

This was likely an unreasonable conclusion. Voluntary intoxication was not "wholly inconsistent" with Miller's chosen defense. To the contrary, Miller seems to have decided to present a primary defense of non-involvement but lay the groundwork for the jury to acquit on the alternative basis that Garcia was intoxicated. Miller elicited testimony from both Esparza and Worthington about Garcia's intoxication on the night of the attack. She asked Esparza to confirm that Garcia was drinking "quite a bit of beer" and was "doing a lot of cocaine" to the point where he was "coked out." She similarly asked Worthington to confirm that Garcia smelled of alcohol when he got into her car, and then did "lines of cocaine" in front of her before getting out of the car. And although the record relating to jury instructions is incomplete, the best understanding of what occurred is that Miller actually requested CALCRIM 625, the more limited voluntary intoxication instruction that was given: just before closing arguments, the trial judge stated, "I am giving the voluntary instruction as it reflects on 625, Ms. Miller," to which Miller responded,

"Thank you, Your Honor." The judge then said, "And that was after going back over my notes on Ms. Worthington."

Given that Miller laid the groundwork for a voluntary intoxication defense and appears to have requested CALCRIM 625, Miller's failure to request the broader voluntary intoxication instruction relating to aiding and abetting liability likely was deficient performance—once she decided to give the jury the opportunity to acquit based on voluntary intoxication, there was no reason to not employ it as a broad defense against both direct *and* aiding and abetting liability, instead of as a limited defense against just direct liability. *Cf. Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015) ("But once the trial court decided to instruct the jury on one lesser included offense . . . there was no longer any conceivable reason for [trial] counsel not to request an instruction on a second lesser included offense."). More generally, courts sometimes assume that if an instruction is not consistent with counsel's primary defense, it would be counterproductive to request it. But, as Miller did here, defense lawyers commonly pursue a primary defense while simultaneously laying the groundwork for and requesting instructions in support of a secondary defense—these requests are not made in the presence of the jury, nor does requesting the instruction obligate counsel to argue the defense to the jury. Requesting these instructions merely creates the possibility that a juror, perhaps unpersuaded by counsel's primary defense, will latch on to the alternative basis for acquittal. Perhaps sometimes it makes sense to avoid an instruction on an alternative theory. But given that one juror is all defense counsel needs, there is sometimes every reason to request it and no good reason to forego it. This appears to be one of those cases. *But see Pensinger v. Chappell*, 787 F.3d 1014, 1031 (9th Cir. 2015) (appearing to state categorically that "[w]here counsel pursues one theory of the defense over another, counsel's lack of request for a jury instruction on the alternate theory does not constitute deficient

performance").

In any event, there was no prejudice from Miller's failure to request the broader voluntary intoxication instruction relating to aiding and abetting liability. Although there was some evidence introduced at trial about Garcia's drinking and cocaine use on the night of the attack, it was relatively inconsequential, and neither the prosecution nor the defense made it a focus of their case. At a minimum, the evidence of Garcia's intoxication was too insubstantial to conclude that if the jury had considered it in the context of aiding and abetting liability, there is a reasonable probability that they would have found he lacked the requisite knowledge or intent. As a result, Miller's performance with respect to the voluntary intoxication instruction does not entitle Garcia to relief.[24]

## VI.    CONCLUSION

For these reasons, the habeas petition is denied. A certificate of appealability will issue on the entire habeas petition. Although this Court perceives some of Garcia's arguments to be quite weak, they are intertwined with the strong ones—with respect to both deficient performance and prejudice. And the Court of Appeals may well differ with this Court on the relative strength of Garcia's various arguments about Miller's performance, and the effect of her performance on the verdict.

---

[24] Garcia makes the related argument that the failure to give the broader voluntary intoxication instruction violated his due process rights to a fair trial. The California Court of Appeal rejected this claim on direct review, holding that the claim was not cognizable under California law because voluntary intoxication instructions are "pinpoint" instructions that trial courts are not required to give unless requested by a defendant. *Garcia*, 2014 WL 667483, at *9-10 (citing *People v. Rundle*, 43 Cal. 4th 76, 145 (2008)). Because Garcia neither requested the broader voluntary intoxication instruction nor objected to the voluntary intoxication instruction that was given (and in fact appeared to request it), he could not, under California law, challenge the instruction on appeal. *See id.* Garcia's due process claim is thus procedurally barred because he defaulted the claim on direct appeal under California law. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Fairbank v. Ayers*, 650 F.3d 1243, 1256-57 (9th Cir. 2011).

**IT IS SO ORDERED.**

Dated: April 29, 2021

_____
VINCE CHHABRIA
United States District Judge